## WESTMORELAND ETC. N. GAS CO. v. IRA DeWITT ET AL.

APPEAL BY PLAINTIFF FROM THE COURT OF COMMON PLEAS
OF WESTMORELAND COUNTY, IN EQUITY.

Argued October 9, 1889—Decided November 11, 1889.
[To be reported.]

1. Under a lease of land for the sole purpose of drilling and operating for oil and gas, the lessee's right in the surface of the land is in the nature of an easement of entry and examination, with a right of possession arising where the particular place of operation is selected, and the easement of ingress, egress, storage, transportation, etc., during the continuance of operations.

2. The real subject of possession to which the lessee is entitled, is the oil or gas contained in or obtainable through the land: these are minerals feræ naturæ, and are part of the land and belong to its owner only so long as they are in it and under his control; the lessee, when he has drilled a gas well and controls the gas produced thereby, is in possession of all the gas within the land.

3. The fact that the gas from such well is not kept flowing into the pipeline of the lessee, but is shut in the well as a reserve for use in emergencies, does not affect the possession of it by the lessee when he is in control thereof by means of a connection between the well and his pipeline, so arranged that he can have the gas flow into his line at any time.

4. That the lessor, claiming a forfeiture of the lease, ordered the lessee's agent, who was measuring the pressure of the well, off the premises, and the agent withdrew, or, that in consequence of a like order, agents

of the lessee who were on the land to locate a second well, withdrew without doing so, is no evidence of an ouster of the lessee from his possession.

5. Where the lessee is thus in possession of the gas underlying the premises, equity has jurisdiction to restrain the lessor from drilling on the leasehold, the rights granted to the lessee being necessarily exclusive, and the damage to arise from the threatened waste, being entirely incapable of measurement at law, even if not irreparable.

6. When the premises embraced in an oil- and gas-lease, are described as "all that certain tract of land," etc., a clause therein providing that no wells shall be drilled within a limited area, is neither an exception nor a reservation, but simply a limitation upon the privilege of drilling granted to the lessee, confining his drilling without the area specified.

7. A clause in a lease providing for a forfeiture thereof, in the event of a default by the lessee in the performance of his covenants, is not self-operating, so as to make the forfeiture take place, ipso facto, upon the occurrence of the default; but, being for the benefit of the lessor, it rests with him to enforce or waive it.

8. Forfeitures are to be construed strictly; and where a lease provides that it shall become forfeited, if any of the payments provided for are not made, a whole payment is meant, not a balance on a running account; wherefore, if a part of a payment be accepted before it is due, no forfeiture is incurred by a failure to pay the remainder in the time specified.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 167 October term 1889, Sup. Ct.; court below, number and term not given.

On May 31, 1887, the Westmoreland and Cambria Natural Gas Company filed a bill in equity against Ira DeWitt, John H. Brown and others, averring that the defendant John H. Brown, being the owner of a certain tract of land in the bill described, demised the same to J. M. Guffey & Co. on December 7, 1885, for the sole and only purpose of drilling and operating for petroleum oil and gas; that this lease was afterwards duly assigned to the plaintiff and the plaintiff entered upon the possession and enjoyment of its estate in said land, drilled a large gas well thereon, and, relying upon the supply of gas to be obtained from said well and others in the vicinity, had expended large sums in laying pipe-lines for its transportation to engage in the business of supplying natural gas to the public; that said Brown, alleging the forfeiture of said lease by reason of the non-payment of a small sum of money, had made a sec-

ond lease of said land to the defendant DeWitt, who, with the assistance of the other defendants, was about to drill a gas well on the premises; that such well could be drilled and gas obtained in about forty days, and that defendants thereby could commit enormous waste upon the estate of the plaintiff, and do irreparable damage to its property and business, long before final hearing; praying for an injunction to restrain the defendants from drilling such well or in any way committing waste upon the plaintiff's estate, and for general relief. Attached to the bill, as an exhibit, was a copy of the lease from Brown to J. M. Guffey & Co., the material parts of which were as follows :

" This agreement, made this 7th day of December, 1885, . . . . . witnesseth that the party of the first part [J. H. Brown] in consideration of the stipulations, rents and covenants hereinafter contained on the part of the said party of the second part [J. M. Guffey & Co.], his executors, administrators and assigns, to be paid, kept and performed, hath granted, demised and let unto the said party of the second part, his executors, administrators and assigns, for the sole and only purpose of drilling and operating wells, and storing, transporting and conveying petroleum oil or gas through, over and from it, all that certain tract of land, . . . . . No wells to be drilled within three hundred yards of the brick or stone building belonging to J. H. Brown. To have and to hold the said premises for the said purpose only, unto the party of the second part, his executors, administrators and assigns, for, during and until the full term of twenty years next ensuing the day and year above written; . . . . It is further agreed, that if gas is obtained in sufficient quantities and utilized, the consideration in full to the party of the first part shall be five hundred dollars, for each and every well drilled on the premises herein described, per annum, payable quarterly in advance from completion of each and every well drilled and utilized. . . . . The said party of the first part to fully use and enjoy the said premises for the purpose of tillage, except such part as shall be necessary for said operating purposes. . . . . Operations on the above described premises shall be commenced, and one well completed within three months from the date hereof; and in case of failure to complete one well within such time, the party of the second part hereby agrees to pay to the party of the first

part for such delay the sum of one hundred and twenty-five dollars ($125.00) every three months from the date of this agreement, payable to J. H. Brown; and the party of the first part hereby agrees to accept such sum as full consideration and payment for such delay until one well shall be completed; and a failure to complete one well, or to make any of such payments within such time and at such place as above mentioned, renders this lease null and void and to remain without effect between the parties hereto. It is further agreed, that a second well shall be completed within fifteen months after the completion of the first well. It is further agreed, that if any of the within payments remain unpaid thirty days, then this lease to to be null and void. . . . . It is understood by and between the parties to this agreement that all conditions between the parties hereto shall extend to their heirs, executors and assigns," etc.

Upon the filing of the bill, a preliminary injunction was granted, and by a subsequent order the injunction was continued until final hearing.

The defendants answered the bill, denying that the plaintiff had expended large sums in laying lines for the transportation of gas from the premises leased to J. M. Guffey & Co.; that the gas from said premises was necessary to the plaintiff's business, or that its loss would result in irreparable injury; and averring that the said lease was forfeited by reason of the plaintiff's default in making the payments therein mentioned; that the plaintiffs had no claim or title to, or rights in, the land within a radius of three hundred yards from the buildings of the lessor, and the well proposed to be drilled by the defendants was located within the limits of said radius; praying that the injunction be dissolved and the defendants dismissed, etc.

Issue having been joined upon the bill and answer, the case was referred to *Mr. Joseph A. McCurdy*, as examiner and master, who on February 6, 1888, filed a report as follows:

### FINDINGS OF FACT.

1. On and prior to December 7, 1885, John H. Brown, one of the respondents named in the bill, was the owner in fee of a certain tract of land, situate in Penn and Hempfield townships, Westmoreland county, adjoining lands of Klingensmith's

heirs, George Croushore, Penna. R. Co., J. F. Thompson, Matthew Black, Gust Mensinger and others, and containing one hundred and forty acres, more or less.

2. On the said 7th December, 1885, the said John H. Brown executed and delivered to J. M. Guffey & Co. the lease set forth and contained in the appendix to the complainant's bill. Said lease is duly recorded.

3. J. M. Guffey & Co. afterwards duly assigned and transferred to the Westmoreland and Cambria Natural Gas Company, the corporation complainant, the said lease, as appears by their assignment duly recorded.

4. The complainant entered upon the premises described in said lease and drilled a gas well thereon, which well was completed on April 23, 1886. Said well is of great capacity, showing a high pressure of gas. Said complainant also laid a pipe line from said well, but has never regularly used the gas from said well, it being shut in nearly all the time.

5. J. M. Guffey & Co., or their assignee, the corporation complainant, paid to John H. Brown, on account of said lease as follows, to wit: on December 8, 1885, per receipt on agreement, $250; on June 22, 1886, per complainant's exhibit B, $250.

6. [During several months prior to the filing of the bill in this case, from January 7, 1887, John H. Brown, claiming a forfeiture of said lease, had taken full and absolute possession of the premises and rights mentioned and granted in the lease.] [1]

7. On March 17, 1887, John H. Brown filed a bill in equity, at No. 57, Equity Docket, Common Pleas of Westmoreland county, claiming that the above named lease had been forfeited and praying, inter alia, the court to order and decree that the said lease be declared null and void. But on June 23, 1887, John H. Brown, the complainant in said bill, discontinued his action.

8. On May 10, 1887, John H. Brown leased the said tract of land for gas purposes to Ira DeWitt, another of the respondents in this case.

9. Said Ira DeWitt, under his lease from Brown, entered upon said tract of land, and, with the assistance of the other respondents, his employees, having collected thereon lumber and other necessary material, began the erection of a derrick for the purpose of drilling a gas well, within three hundred yards of

the stone building belonging to said John H. Brown, and so continued until restrained by the injunction served in this case.

10. The tract of land described in the lease lies wholly within the Grapeville natural gas belt, and has become very valuable as natural gas territory.

11. The bill and answer and evidence in this case disclose an earnest contest between complainant and respondents as to who has the legal right to the property described in the said annexed lease.

The facts found above are not disputed in the bill, the answer, the pleadings, or the evidence.

Owing to his findings of law on the above facts, and his opinion given below, the master deems it proper not to proceed any further for the present in his findings of fact.

### CONCLUSIONS OF LAW.

The complainant's bill and the respondents' answer, as well as the evidence produced, present simply a case of property claimed by one party, complainant, [in the possession of another party, respondents.] [2] The complainant claiming to have the legal right to the premises and property in dispute, asks that the respondents be restrained by injunction from in anywise invading said estate or doing any act that would tend to waste and destroy the same; while, on the other hand, the respondents, who are in possession, deny that the complainant has any right whatever to the property, and furthermore claim that the legal right to the estate in the premises is in themselves.

By the terms of the lease from John H. Brown to J. M. Guffey & Co., the premises described in the lease were leased "for the sole and only purpose of drilling and operating wells, and storing, transporting and conveying petroleum oil or gas through, over and from" the same premises, under certain covenants, conditions and stipulations set forth in the lease. Natural gas and petroleum oil are fluids that, from what scientific knowledge can be obtained on the subject, and from the evidence in this case of J. M. Guffey and other experts, may be classed together, when the property in them and the rights thereto are considered in law. From the words of the lease, "petroleum oil or gas," it would seem that the parties to the lease so regarded them.

Master's Report.

The Supreme Court have decided that " oil is a mineral, and being a mineral, is a part of the realty : " Funk v. Haldeman, 53 Pa. 248; Stoughton's App., 88 Pa. 201.   Mr. Justice GORDON says, in the last cited case: " In this, it [oil] is like coal or any other natural product which in situ forms part of the land. . . . . . Whenever a conveyance is made of it, whether that conveyance be called a lease or deed, it is in effect the grant of part of the corpus of the estate and not of a mere incorporeal right."   It must follow then, that, if from a legal standpoint natural gas be classed with oil, it is a mineral, and is, therefore, a part of the realty, and the above opinion of the learned justice is applicable also to natural gas.

But it matters not how the property or rights mentioned in the lease may be considered.   The title in it is strictly a legal one.   In the case of the North Penn. Coal Co. v. Snowden, 42 Pa. 488, the Supreme Court have decided this question and the opinion of Mr. Justice STRONG is directly applicable to this case.   In it he says, inter alia : " Even the title stated by the complainant to be in himself, is a strictly legal one, whether it be a corporeal or incorporeal hereditament, or an easement; " . . . . . " and if the complainant's rights are incorporeal, rather than an interest in the coal or minerals, the case which he presents is not the less a case at law, and without the jurisdiction of a court of equity.   His rights are strictly legal, and his remedies are at law.   His bill does not even allege that he is without an adequate remedy at law.   It may be admitted that to prevent the disturbance of an acknowledged easement, a court of equity will interfere.   But the right of the plaintiff must be acknowledged or established at law before he can resort to a chancellor."

The rights of the parties in this case depend upon the question of title ; and this must be decided in the legal way of settling questions of title.   The complainant, being out of possession, but claiming title to the property, asks the court to restrain by injunction the respondents, who are in possession.   If the complainant has a clear and undisputed title, the intervention of the court by injunction to restrain the respondents might be the proper procedure.   But, if, as the respondents contend, the complainant has no title to the premises, the complainant would certainly not be entitled to the injunction.

### Master's Report.

[The case, then, narrows itself down to a pure question of title, and, with the complainant out of possession and the respondents in possession, is really an ejectment bill.] [3]     The parties stand in no relation to each other that would give a court of equity jurisdiction, and there is no complication of accounts or other ground of equitable relief.   Much of the testimony taken relates to title.   The simple denial of the respondents in possession of the complainant's right, is conclusive against jurisdiction, until the right has been established at law and is sufficient to warrant their ejectment.   " Orders and decrees in equity, where there is no jurisdiction, are simply coram non judice."   The remedy of the complainant was by ejectment.

—Citing Barclay's App., 93 Pa. 50 ; Washburn's App., 105 Pa. 480 ; Messimer's App., 92 Pa. 168 ; Long's App., 92 Pa. 171 ; North Penn. Coal Co. v. Snowden, 42 Pa. 448 ; Gloninger v. Hazard, 42 Pa. 389 ; Kennedy's App., 81* Pa. 163 ; Norris's App., 64 Pa. 275 ; .Tillmes v. Marsh, 67 Pa. 507 ; Grubb's App., 90 Pa. 228 ; Bispham's Eq., §§ 37, 440 ; Brown v. Vandergrift, 80 Pa. 142 ; Munroe v. Armstrong, 96 Pa. 311 ; Rhea v. Forsyth, 37 Pa. 503 ; Leininger's App., 106 Pa. 398 ; Brown's App., 62 Pa. 17 ; High on Injunctions, § 651, the master proceeded:

The answer of the respondents does not raise the objection to the jurisdiction of a court of equity, but the objection was pressed by their counsel in the argument before the master ; and, from the opinion of your Honor rendered on June 20, 1887, the master infers that it was raised in the nature of a demurrer at the preliminary hearing.   In Wiser's App., 9 W. N. 508, the Supreme Court decided that filing an answer and proceeding to proof is not a waiver of objection to the jurisdiction of a court of equity.   The respondent is not bound to take the objection in limine.   " It is clear that the objection to the jurisdiction in equity may be taken on final hearing."

Although, according to legal precedent, when a bill in equity is dismissed for want of jurisdiction the payment of costs falls upon the complainant, yet in this case the respondents did not regularly demur to the bill, nor did they object to the jurisdiction in their answer; and in the light of Messimer's App., 92 Pa. 168 ; Long's App., 92 Pa. 171, and Maguire's App., 102 Pa. 120, it would seem proper that the complainant should pay all

the costs of this case except those of the respondents' witnesses, which should be paid by the respondents.

In his findings of fact and law in this case, the master has not expressed any opinion respecting the merits of the controversy. Under the circumstances this would be improper.

From the law and the evidence of the case, as understood and found by the master, he is clearly of the opinion: [That the bill of the complainant ought to be dismissed and the injunction dissolved:] [4] That the complainant ought to be ordered to pay all the costs except the costs of the witnesses for respondents; and that the respondents ought to be ordered to pay the costs of their own witnesses.

Exceptions on the part of the plaintiff to the master's findings of fact,[1] [2] and conclusions of law,[3] [4] which had been filed with and overruled by the master, were upon the filing of his report renewed before the court.

In the exception to the finding respecting the plaintiff's possession of the leased premises,[1] were embodied quotations from the testimony of witnesses for the plaintiff, tending to show: That, from the time of its completion down to the hearing before the master, the Brown well, drilled by the plaintiff on the demised land, was connected with the plaintiff's main line, ready to be turned in at any minute, the gas being shut in and held as a reserve, for immediate use in case of anything happening to either of the other wells in actual use for supplying the city of Johnstown, and as a reserve well it was of great importance and value to the plaintiff; that at any time, by simply opening a valve the gas from the Brown well would be turned into the line and would go to Johnstown; that on one occasion, during the winter of 1886–7, it was turned into the line for about five minutes to try it.

There was other testimony which, the defendants claimed, had a bearing upon the question of possession, and established the fact that Brown had taken exclusive possession of the leased premises prior to the filing of the bill. It was to the effect that on April 5, 1887, W. S. Guffey, representing the plaintiff company, came upon the land to see about locating a second well under the provisions of the lease, whereupon Brown said to him: "Mr. Guffey, you have no right upon this

land; you have forfeited all claims and all rights under that certain lease and I want you and your men to please withdraw;" that Mr. Guffey replied: "Well, Mr. Brown, just put that in writing;" that then Brown drew up and handed to Guffey a paper notifying him that the plaintiff company had forfeited all its rights under the lease of December 7, 1885, and that any trespassing upon the premises would not be permitted; that Mr. Guffey and the men who were with him then withdrew; that on April 22, 1887, J. H. Galey, the superintendent of the plaintiff company, went to the well on the demised land for the purpose of measuring the pressure of the gas; that Brown went to him and told him to leave and take his men off the premises as fast as he could, to which Galey replied that he would do so in five minutes, when Brown told him to leave in one minute; and that Galey and his men did leave in a very few minutes. There was also testimony that on January 15, 1887, the plaintiff offered to pay Brown $250, on account of rentals on the lease, but that he refused the tender on the ground that the lease was forfeited.

The exceptions filed by the plaintiff to the report of the master were disposed of in the following opinion by HUNTER, P. J.:

"We have carefully examined the master's report, his finding of the facts and his exhaustive opinion, together with authorities cited and the reasons given by him, and we are unwilling to say that he has erred either in the finding of the facts or in his opinion. We admit the case is a close one."

A decree was then entered dismissing the bill and directing that the plaintiff pay the costs, except the fees of the defendants' witnesses. Thereupon the plaintiff took this appeal, specifying that the court erred in overruling the plaintiff's exceptions and in entering the final decree.

*Mr. Jas. S. Moorhead* (with him *Mr. John B. Head*), for the appellant:

1. The bill averred that the plaintiff had entered upon the possession and enjoyment of its estate. The answer made no denial of its possession. Under the practice in equity, it was therefore unnecessary to prove the company's occupation, and

the master in reaching his conclusion was compelled to disregard the pleadings. The evidence, however, although not taken with reference to this feature of the case, contained a vast array of proof of possession by the complainant, and nothing to the contrary. It showed that the plaintiff had the gas from the Brown well connected with its main, ready for use at any moment.

2. The occurrences of April 5, and April 22, 1887, do not show any exclusion of the plaintiff from this possession. The act of the company's agent on April 5th, was a most prudent and commendable one. It left the parties standing on their respective rights then existing, and yielding nothing. The possession of the first well, and, through it, of the gas underlying the land, was not discussed. The testimony as to the incident of April 22d, when Galey was measuring the pressure, shows three things : (1) that the company used the well freely as it pleased; (2) that its agents and servants went there when it was necessary; and (3) that they left when their business was done, and not before.

3. In finding that Brown was in possession, the master lost sight of the character of the lease, and supposed that because he had possession of the surface for certain purposes, a possession distinctly reserved in the lease, he was in absolute possession of the entire farm in the same manner as before the lease was executed ; or else that the invasion of the plaintiff's rights complained of in this bill was an ouster of the plaintiff from all occupancy under the lease. The testimony is that Brown was always in possession of the land for agricultural and some other purposes, and the company was always in possession for the purpose of operating for oil and gas; holding the gas by such possession as its nature permits.

4. What effect shall be given to the master's finding respecting the fact of possession ? We deny that is equivalent to the verdict of a jury. This is not the case when there is no sufficient evidence to support the finding, or when the master has erred in his inferences from clearly proved facts : Cake's App., 110 Pa. 67 ; Worrall's App., 110 Pa. 349. In our case, we have a fact found without proof, viz. : the absolute possession of the defendant Brown ; a material fact established by the proof not found, to wit : that the only possession of the gas was by the

connection at the well in the control of the plaintiff, and a perfunctory consideration of the evidence by the master and the court.

5. But suppose that Brown was in full and absolute possession: would our remedy then have been ejectment? In so holding the master was misled by a line of cases governing conveyances of coal and oil in situ. Starting with Stoughton's App., 88 Pa. 198, he was easily led astray by the decision that oil in situ is part of the realty. Perhaps, too, he was misguided by a dictum in the opinion, which has been corrected in Chamberlain v. Dow, 16 W. N. 532. Our lease is not a sale of the gas in situ. It creates an incorporeal hereditament which cannot be the subject of an action of ejectment: Funk v. Haldeman, 53 Pa. 229; Chamberlain v. Dow, supra; Black v. Hepburne, 2 Y. 331; Johnstown Iron Co. v. Cambria Iron Co., 32 Pa. 241; Titusville Novelty I. Works' App., 77 Pa. 103.

6. Nor would trespass be an adequate remedy. Injunction is the proper one: Allison's App., 77 Pa. 221; Masson's App., 70 Pa. 26; Smith's App., 69 Pa. 475; Leininger's App., 106 Pa. 398. Injunctions will be granted when more convenient than a remedy at law: Bierbower's App., 107 Pa. 14; Brush etc. Co.'s App., 114 Pa. 574; Earley's App., 121 Pa. 496. In Barclay's App., 93 Pa. 50, and Washburn's App., 105 Pa. 480, quoted by the master, there was no contract relation between the parties. Equity will enjoin the invasion of a right secured by contract: Commonwealth v. Railroad Co., 24 Pa. 159; Earley's App., 121 Pa. 496; Hacke's App., 101 Pa. 245. But even if the jurisdiction were doubtful, such an objection is too late after a hearing on the merits: Adams's App., 113 Pa. 449; Sunbury etc. R. Co. v. Cooper, 33 Pa. 278.

*Mr. D. S. Atkinson* (with him *Mr. J. M. Peoples*, *Mr. Vin E. Williams* and *Mr. W. A. Griffith*), for the appellees:

1. The lease was clearly forfeited on November 23, 1887. On March 7, 1886, there accrued a payment of $125 for delay in completing the well. Its completion did not take place until April 23d, forty-six days later. For this additional delay the sum of $65.26 would be payable, and upon the completion a quarter's rent on the well became payable in advance. The total amount payable on April 23d was therefore $315.26. On

this the company was entitled to a credit of $250 for the payment in advance made December 8, 1885, leaving due a balance of $65.26. The payment of $250, made June 22d, extinguished this balance, paid the instalment of rent to accrue July 23d, and $59.74 on account of the instalment to accrue October 23d, leaving unpaid of the latter instalment the sum of $65.26. No payment or tender of this was made within thirty days after it accrued.

2. The lease having been forfeited in fact and in law, according to its own terms, the defendant Brown took full, entire and absolute possession of the premises. This possession was so notorious and open that the plaintiff was compelled to acknowledge and submit to it. On April 5, 1887, when Guffey came upon the land as the representative of the company, Brown made such an assertion of ownership and absolute possession as could not be doubted or overlooked by the company. In obedience to it, Guffey and his men withdrew, returning to the company, as their reason for so doing, Brown's notice in writing. Beyond the fact that the gas naturally flowed into the line laid by the plaintiff, until its escape at the end, or until its flow was arrested by gates or valves controlled by the plaintiff, the plaintiff had no control or possession of this farm after the completion of the well, and Brown in fact for all purposes was in full possession after January 7, 1887.

3. It is argued that the plaintiff had constructive possession of the well; but the testimony clearly shows that it has never been used by the company, and there has never been any attempt to use it, or to assert possession of it, or of 'the leased premises, since Brown took possession. The master's finding on the question of possession is fully borne out by the law and facts. The plaintiff's remedy for any wrongs it may have suffered is by action at law. In Brown v. Vandergrift, 80 Pa. 142, the rights granted were identical with those conferred by the present lease, and in that case, as also in Munroe v. Armstrong, 96 Pa. 311, ejectment was the remedy employed. Such contracts as the present one, providing for forfeitures, are not odious, but will be strictly enforced: Brown v. Vandergrift, supra; Munroe v. Armstrong, supra.

OPINION, MR. JUSTICE MITCHELL:

Complainants filed a bill, setting forth a lease of land from

Brown, one of the respondents, for oil and gas purposes; the expenditure of large sums of money under the lease; a subsequent lease of the same land by Brown to the other respondents, who took with knowledge of complainants' rights; and the entry by them with the intent to drill a well upon the said land, and take gas, etc. The bill concluded with an averment that such a well could be drilled and put in operation in about forty days, long before an adjudication could be had upon the rights of the parties, and that thereby enormous waste would be committed upon the premises of complainants, and irreparable injury to their interests; wherefore they prayed an injunction, etc.

The answer of respondents substantially admitted all of the facts set up in the bill, except that the well which they were about to drill was on premises leased to complainants, and that irreparable injury to complainants would result therefrom; and further setting up that the lease to complainants had been forfeited for non-payment of certain moneys due thereunder.

Two issues, therefore, were raised by the pleadings: first, whether the well contemplated by the respondents was upon the leased land; and, secondly, whether there had been a forfeiture of the lease. The actual facts not being disputed, both these issues really turned on the construction of the lease.

Under these issues the parties went on for some months, and completed their evidence. When, however, the case came to be argued before the master, the respondents took the ground that the complainants, being out of possession, and their title being disputed, had no standing in equity, but must first establish their rights at law. The learned master adopted this view, found as a fact that complainants were out of possession, and reported as a conclusion of law therefrom that the bill must be dismissed. The court below adopted this report with only a formal opinion, expressing unwillingness to say the master had erred.

The master finds formally that, "during several months prior to the filing of the bill, Brown, claiming a forfeiture of said lease, had taken full and absolute possession of the premises and rights mentioned and granted in the lease." An examination, however, of the evidence fails to disclose a single fact on which such a finding can be sustained. It rests entirely

on a misconception of the subject-matter of the possession in question, and the nature of the possession itself of which the subject-matter admitted. The subject of possession was not the land, certainly not the surface. All of that, except the portions actually necessary for operating purposes, was expressly reserved by the lease, to Brown, the lessor. Except of such portions, the complainants had no possession that was not concurrent with that of the lessor, if, indeed, it could be called possession of the land at all. Complainants' right in the surface of the land under the lease was rather in the nature of an easement of entry and examination, with a right of possession arising where a particular place of operation should be selected, and the easement of ingress, egress, storage, transportation, etc., during the continuance of the operation. The real subject of possession to which complainant was entitled under the lease was the gas or oil contained in, or obtainable through, the land. The learned master says gas is a mineral, and while in situ is part of the land, and therefore possession of the land is possession of the gas. But this deduction must be made with some qualifications. Gas, it is true, is a mineral; but it is a mineral with peculiar attributes, which require the application of precedents arising out of ordinary mineral rights, with much more careful consideration of the principles involved than of the mere decisions. Water also is a mineral; but the decisions in ordinary cases of mining rights, etc., have never been held as unqualified precedents in regard to flowing, or even to percolating, waters. Water and oil, and still more strongly gas, may be classed by themselves, if the analogy be not too fanciful, as minerals feræ naturæ. In common with animals, and unlike other minerals, they have the power and the tendency to escape without the volition of the owner. Their "fugitive and wandering existence within the limits of a particular tract is uncertain," as said by Chief Justice AGNEW in Brown v. Vandergrift, 80 Pa. 147, 148. They belong to the owner of the land, and are part of it, so long as they are on or in it, and are subject to his control; but when they escape, and go into other land, or come under another's control, the title of the former owner is gone. Possession of the land, therefore, is not necessarily possession of the gas. If an adjoining, or even a distant, owner, drills his own land, and taps your gas,

so that it comes into his well and under his control, it is no longer yours, but his. And equally so as between lessor and lessee in the present case, the one who controls the gas, has it in his grasp, so to speak, is the one who has possession in the legal as well as in the ordinary sense of the word.

Tested by these principles, there is not the slightest doubt that the possession of the gas, as well as the right to it under this lease, was in the complainants when the bill was filed. They had put down a well, which had tapped the gas-bearing strata, and it was the only one on the land. They had it in their control, for they had only to turn a valve to have it flow into their pipe, ready for use. The fact that they did not keep it flowing, but held it generally in reserve, did not affect their possession any more than a mill-owner affects the continuance of his water-right when he shuts his sluice-gates. On the other hand, Brown had no possession of the gas at all. His possession of the soil for purposes of tillage, etc., gave him no actual possession of the gas; and he had no legal possession, for his lease had conveyed that to another. How, then, had he taken "full and absolute possession of the premises and rights," as found by the master? Apparently he had asserted to the complainants his claim that the lease was forfeited. In addition, on one occasion, when the agent of complainants was at their well for a specific purpose, Brown had ordered him off the land; but there is no evidence that he went until he had finished his business there. Shortly before this the complainants had sent men on the land to begin the erection of a derrick for a second well, and Brown had ordered them off. This, which is the strongest item in the proof, is really no evidence at all of dispossession of complainants. They still remained in possession of their well, which gave them the sole control of the gas, so far as its utilization was concerned, and the sole possession of which it was capable, apart from the land, from which it had been legally severed by the lease. The utmost that can be said of such an occurrence is that it was a violent and temporary interference with that portion of complainants' rights which authorized them to put down a second well. This was no more a dispossession of complainants from their occupation of the gas, than blocking up one of a farmer's roads to his home would be an ouster from his farm.

We are therefore of opinion that the master was wrong in finding as a fact that complainants were out of possession, and should be remitted to an ejectment to establish their title at law. As to the other objections to the jurisdiction of equity, they require but a brief notice. The bill is a bill to stay waste, and that the damage threatened, even if not irreparable, is entirely incapable of measurement at law, cannot be seriously questioned. Such cases were among the earliest, and have always been among the most incontestable, within the chancellor's jurisdiction. It is superfluous to cite authorities for so familiar a principle, but I may refer to Allison's App., 77 Pa. 221, as a recent case in this court, where the invasion restrained was of complainants' right to oil, a fluid far more capable of accurate measurement than gas.

The learned master having come to the conclusion that the bill should be dismissed for want of equity, forbore to consider and pass upon the substantial issues raised by the pleadings. But as the evidence was fully taken by both parties before him, and he has found all the facts necessary to a final determination of the whole controversy, we will proceed to consider it. The actual facts, as already said, are not disputed, and both issues substantially depend upon the construction of the lease.

We have therefore to consider, first whether the well threatened to be put down by respondents was upon the leased land. Of this there cannot be the slightest doubt. The lease is of "all that certain tract of land," etc. This means the whole tract. The grant is limited as to intention " for the sole and only purpose of drilling and operating wells," etc., but is not limited as to territory. Following the description of the tract is the clause on which respondents rely: "No wells to be drilled within three hundred yards of the brick building belonging to J. H. Brown." The well which respondents propose to bore is within this prohibited distance; and the respondents claim that Brown, and they as his lessees, have the right to drill wells within that part of the territory. But the clause in question is neither a reservation nor an exception as to the land, but a limitation as to the privilege granted. It does not in any way diminish the area of the land leased; that is still the whole tract; but it restricts the operations of the

lessees in putting down wells to the portions outside of the prohibited distance. For right of way and other purposes of the lease, excepting the location of wells, the space inside the stipulated line is as much leased to the lessee as any other part of the tract. The terms of the grant would imply the reservation to the lessor of the possession of the soil for purposes other than those granted to the lessee, and the parties have expressed what otherwise would have been implied by the provision that the lessor is "to fully use and enjoy the said premises for the purpose of tillage, except such part as shall be necessary for said operating purposes." From the nature of gas and gas operations, already discussed, the grant of well-rights is necessarily exclusive. It was so held even as to oil-wells, in Funk v. Haldeman, 53 Pa. 229, 247–248, although in that case the plaintiff had a mere license to enter, etc., and not, as complainants here, a lease of the land; and it is exclusive, in the present case, over the whole tract. As already said, the clause relative to the three hundred yards distance was a restriction on the privilege granted, not a reservation of any land or any boring rights to the lessor; and a well upon the prohibited portion was just as damaging to the lessees as upon any other portion of the tract. The drilling of the well threatened by respondents is therefore in violation of the lease, and should be enjoined if the lease is still in force.

Secondly, has there been a forfeiture of the lease? It is claimed by respondents, on account of the failure of the lessee to make certain stipulated payments. The lease is dated December 7, 1885, and by its terms the lessee was to pay $500 a year for each gas-well, payable quarterly, in advance, from the completion of each and every well; and in case one well should not be completed within three months from the date of the lease, then to pay "for such delay the sum of one hundred and twenty-five dollars every three months from the date of this agreement; . . . . and [lessor] agrees to accept such sum as full consideration and payment for such delay until one well shall be completed; and a failure to complete one well, or to make any of such payments, within such time and at such place as above mentioned, renders this lease null and void. . . . . It is further agreed that if any of the within payments remain unpaid thirty days, then this lease to be null and void." These are all the

provisions which bear upon the present question, and their effect is entirely clear.    One well is to be completed in three months, and the rent is to begin from its completion.    This is the primary intent and expectation of the parties.    But, if not so completed, then the lessee is to pay a like amount from the date of the agreement, until one well is completed, and thereafter, of course, the payments are not to be for delay at the end of each three months, but as rent quarterly in advance.    A failure to pay any of the sums due for a period of thirty days is to render the lease null and void.    The first provision for forfeiture cannot be read literally and separately, as it is in manifest conflict with the other covenants.    Thus it invokes a forfeiture for failure to complete one well in three months, but in so doing it is repugnant to the agreement to accept the stipulated "full consideration and payment for delay."    Again, it imposes the forfeiture for failure to make any of the payments at the time and place mentioned, and in so doing is in conflict with the subsequent agreement that the forfeiture shall only be for a default of thirty days.    Reading all these clauses together, therefore, as we are bound to do, the last-mentioned clause, calling for a forfeiture upon a default of thirty days in the payments, is the only one that is effective for the purpose of forfeiture.

Before passing to the acts of the parties, it may be well to notice very briefly the construction of the agreement set up by the respondents in their answer, though not pressed in their argument.    It is that the default in payment ipso facto created a forfeiture; or in other words, that the forfeiture was absolute and self-operating, without regard to the acts or wishes of the parties.    Such a construction is utterly untenable.    It is contrary, not only to the settled rules of law, but to the manifest intentions of the parties.    This question is definitively settled in Wills v. Gas Co., decided at the present term, the opinion in which is filed herewith by, our Brother CLARK: ante, 222.

Coming now to the facts as reported by the master and practically undisputed, we find that the parties from the outset entirely disregarded the strict times and terms of payment, as set out in the lease.    On the day following the date of the lease the lessees paid $250 on account.    It is admitted that such payment was made, and that it was a voluntary advance, as nothing was or would be due under the lease for three months, and then only

half that amount.    In June another payment of $250 was made,
and this, again, was more than was due under any possible con-
struction of the lease.    A quarterly payment for delay had be-
come due on March 7, 1886.    The well being completed April 23,
there would, under the construction contended for by the lessor,
then be due compensation for the forty-six days of additional
delay, amounting to $65, and a quarter's rent in advance, which
latter was covered by the advance of $250 in the previous De-
cember.    The June payment, therefore, fully covered this $65,
another quarter's rent from July 23d to October 23d, and an ad-
vance of $60, nearly one half the quarter's rent that would be-
come due in October, four months later.    This calculation, as
already said, is upon the most favorable possible construction
for the lessor.    But in fact there is not the slightest doubt that
both parties entirely disregarded the strict terms of the lease
as to times of payment, and treated the payments of December
and June as semi-annual advances of the stipulated sum, no mat-
ter whether called " compensation for delay " or " rent," as the
amounts in either case were exactly the same.    Neither party
paid the least attention to the possible fag end of a quarter's de-
lay; the lessor never demanded it, no reference to it was made
at the time of the June payment, and it made its appearance in
the transactions months later as an after-thought.    Forfeitures,
if no longer odious,—and I for one am too strongly in favor of
the enforcement of contracts as parties make them to apply harsh
names to strict constructions,—are yet not favored either at law
or equity, and among the least favored have always been those
founded on mere delay in the payment of money.    In this case
there is not the slightest pretence of any other ground for for-
feiture than the failure to pay a small amount of money in ad-
vance.    As already shown, not a single payment under this lease
was made strictly according to its terms ; the departure was be-
gun by the lessor's request, and was always in his favor.    To
allow him now to turn around without notice and enforce a for-
feiture for a failure of the insignificant proportions shown, would
be sanctioning a fraud such as no court has ever permitted.

There is another ground equally fatal.    Forfeitures are always
strictly construed ; and, looking at the facts, none has been in-
curred here, even on respondents' own view of the amounts due.
As already seen, the June payment, deducting the $65 for de-

lay, still paid the quarter's rent beginning July 23d, and nearly half of the quarter beginning October 23, 1886. Under the lease a forfeiture would not be incurred unless a payment should remain unpaid for thirty days. On October 23d, a quarter's rent was due in advance, but only half of it was unpaid, for half of it had been paid in advance in the preceding June. The lease does not provide a forfeiture for failure to pay a balance, but only " if any of the within payments remain unpaid," which means a whole payment, not a balance on a running account. No forfeiture, therefore, was incurred, or could be, until the next payment should become due and be unpaid for thirty days. The next quarter day was January 23, 1887; and a week before that date, on January 15th, the lessees tendered the rent to Brown, and it was refused. The master's findings of fact, under the view he took, do not extend to the occurrences of January 15, 1887; but the testimony was taken by both parties, and leaves no doubt that there was a valid tender. Both Rhodes and Webb say the money was held in one hand, where Brown could see it, while the voucher was read to him; and Brown himself says Rhodes told him he had come to pay, though he did not actually see the money, and that he told Rhodes it would " be altogether unnecessary " to show the money. This, under the circumstances, dispensed with further formalities.

Whether, therefore, we regard the strict conditions of the lease as waived by the conduct of the parties, or the failure in payment as only a partial and incomplete default, it is equally clear that there was no forfeiture, and the respondents have failed to show any defence to the bill.

> The decree is reversed, the bill reinstated, and the injunction reinstated, made perpetual, and directed to be so issued; costs to be paid by the appellees; and the record is remitted to the court below to excute this order.