**In re GREAT WESTERN PETROLEUM CORPORATION.**

No. 27189–Y.

District Court, S. D. California, Central Division.

Sept. 14, 1936.

Rifkind, McCoy & Rogers, of Los Angeles, Cal., for trustee, V. W. Erickson.

248

Bauer, Macdonald, Schultheis & Pettit and Lee G. Paul, all of Los Angeles, Cal., for Petroleum Rectifying Co. of California.

George T. Goggin, of Los Angeles, Cal., for Oil Tool Exchange, Inc.

YANKWICH, District Judge.

Two orders of the referee are up· for review.

The first arises under the following facts: The Great Western Petroleum Corporation, a corporation, was adjudicated a bankrupt on January 13, 1936. On the same day, upon the petition of Oil Tool Exchange, Inc., a creditor, Ernest Hugh Schroeter, was appointed and qualified as receiver. On January 24, 1936, the Oil Tool .Exchange, Inc., filed a petition alleging that it had sold and delivered to the bankrupt under a conditional sales contract dated August 17, 1935, a "Blue Streak" closed type power gas engine with all its appurtenances for the sum of $1,205.03, and under a conditional sales contract dated November 20, 1935, a "Blue Streak" closed type power unit with high compression cylinder head and all its appurtenances for the sum of $1,040.63. On the day of the filing of the petition there was unpaid balance of $1,170.77. Upon the filing of the petition an order to show cause was issued to the receiver directing him to appear before the referee and show cause why he should not pay the installments due and to accrue under the contracts of sale. Evidently without opposition from the receiver, the referee made an order directing him to pay the installments accruing. At the first meeting of creditors held on February 20, 1936, V. W. Erickson was elected trustee. On April 15, he moved to vacate the referee's order. The matter came before the referee on May 1, 1936, was continued from time to time, and was concluded on June 9, 1936. The referee found that the conditional contracts of sale were valid and directed the trustee to pay the installments due on them. The trustee seeks a review of this order.

The facts under which the second order arises are: On April 21, 1936, Petroleum Rectifying Company of California filed a petition for reclamation of an electrical dehydrator sold under a contract of conditional sale to the bankrupt. On the same day, an order to show cause was issued to the trustee requiring him to appear and show cause why the dehydrator should not be reclaimed by the petitioner for nonpayment of installments under the contract. An amended petition was filed on May 20, 1936. On May 28, 1936, the hearing of the matter was had. The undisputed evidence shows that the contract had been entered into on May 20, 1935, by the rectifying concern and the bankrupt who agreed to purchase the dehydrator for the sum of $825 (plus California sales tax) payable $206.25 cash with the order and the balance in three equal monthly installments thirty, sixty, and ninety days from the date of the contract. The dehydrator was accepted by the bankrupt on May 23, and installed. Defaults occurred under the contract. At the time of the hearing the defaulted installments totaled $412.75. On July 29, 1936, the referee granted the petition. A review of this order is asked by the trustee.

The matters were submitted together because their determination turns around the same fundamental questions. The chief ground for the action of the referee in both cases is the contention, made, which he sustained, that the conditional sales contracts were valid and binding upon the trustee. This upon the ground that they are not instruments which are declared invalid under section 2980 of the California Civil Code (as amended by St.1935,' p. 2230), unless they are acknowledged and recorded within a certain time.

The section, so far as material here, reads: "Every conditional sales contract, lease, and bailment or feeder agreement covering live stock and other animate chattels and every conditional sales contract of *equipment and machinery used or to be used for mining purposes,* must be acknowledged, or proved and certified, and must be recorded within twenty (20) days after its execution in the office ·of the recorder of the county where the buyer, the party feeding, the lessee or the bailee, respectively, resides at the time he executes such contract, lease, feeder or bailment agreement, or in case the buyer, the party feeding, the lessee or the bailee is a nonresident of this State, in the office of the recorder of the county or counties where the property involved is located at the time the contract, lease, feeder, or bailment agreement is executed by the buyer, lessee, or bailee or feeder, and a contract of conditional sale of equipment and machinery used or to be used for mining purposes shall also be recorded in every case in the county where the property is situated, otherwise it shall be void as to

the lien or interest of the seller, the lessor, bailor or owner against bonafide purchasers, encumbrancers and those having no actual knowledge of the contract, lease, feeder or bailment agreement who become creditors of the buyer, the party feeding, the lessee or the bailee, while said property is in the possession of any of the last mentioned parties." Calif.Civil Code, § 2980. (Italics added.) The instruments involved here were not acknowledged or recorded as required by this section. Credit was extended to the bankrupt, while the machinery (equipment) in both instances was in the possession of the bankrupt. Neither creditor had any actual knowledge or notice of the existence of the conditional sales contracts.

The basis of the referee's decision was that equipment and machinery of the type involved cannot be said to be machinery "for mining purposes" within the purview of the section.

The provision relating to equipment and machinery used for mining purposes was added by amendment to the section in 1933 (St.1933, p. 863). However, section 661 of the California Civil Code, *adopted in 1872,* provides: "Sluice-boxes, flumes, hose, pipes, railway tracks, cars, blacksmith-shops, mills, and all other machinery or tools used in working or developing a mine, are to be deemed affixed to the mine."

In Cortelyou v. Baker (1920) 182 Cal. 168, 187 P. 417, the Supreme Court of California held that this section was strictly limited to "a mine in the ordinary meaning of the term" and was not intended to apply to oil operations. The referee felt that this declaration of the highest court of the state called for a similar interpretation of the words "mining purposes" in section 2980.

I do not think that the case can be given that effect.

■ It is to be borne in mind that the court was dealing there with a section which was enacted in 1872, long before oil was discovered in California. California was a mining state. The chief mining in California being gold, the ordinary meaning which the term "mine" had at that time was, as the Supreme Court said, an ordinary mine "such as a quartz or placer mine." More, under the rule of ejusdem generis, which requires that words of general description following words of particular description be interpreted as applying to things of similar character, the

court was bound to interpret the words "machinery or tools used in working or developing a mine" in the light of the preceding words, such as "sluice boxes" and the like. The opinion says: "The kind of property therein described shows that it was intended to apply to a mine in the ordinary meaning of the term, such as a quartz or placer mine." Cortelyou v. Baker, supra, 182 Cal. 168, at page 169, 187 P. 417. In other words, the history of the section, the specific property enumerated, and the common usage at the time, led the court to the conclusion that the word "mine" was used in that section in its primary sense—that of an underground excavation for digging out ore, metal, or coal. See Lindley on Mines (3d Ed.1914) sections 93–97. The like conclusion in Barton v. Wichita River Oil Co. (Tex.Civ.App.1916) 187 S.W. 1043, upon which so much reliance is placed by the creditors, was similarly grounded. The discovery of petroleum has led to a change in terminology. Persons engaged in the industry, geologists and courts generally began to consider oil as a "mineral" and the process of extracting oil from the ground as "mining." Such they are considered at the present time. See Westmoreland & Cambria Natural Gas Co. v. De Witt (1889) 130 Pa. 235, 18 A. 724, 5 L.R.A. 731; Isom v. Rex Crude Oil Company (1905) 147 Cal. 659, 82 P. 317; Callahan v. Martin (1935) 3 Cal.(2d) 110, 43 P.(2d) 788, 101 A.L.R. 871; Burke v. Southern Pacific R. Co. (1913) 234 U.S. 669, 34 S.Ct. 907, 58 L. Ed. 1527; Crain v. Pure Oil Co. (C.C.A.8, 1928) 25 F.(2d) 824; Rice Oil Co. v. Toole County (1930) 86 Mont. 427, 284 P. 145; Shell Petroleum Corp. v. Caudle (C.C.A.5, 1933) 63 F.(2d) 296.

■ By common usage, the word "mining" has thus ceased to be confined to the extraction by excavation from the earth of metals and solid minerals. It is now applied to the extraction from the earth of all substances which are classified geologically as "minerals." It is true that in interpreting words in legislative enactments, the scientific meaning of a term is not the criterion, but the sense in which it is used in everyday life. See United States v. Bhagat Singh Thind (1923) 261 U.S. 204, 43 S.Ct. 338, 67 L.Ed. 616. But oil is *now* so generally considered a mineral and the extraction of oil is *now* so generally considered as mining, that we must assume that the California Legislature of 1933, in using the word "mining"

in the section, used it in the sense in which that word had come to be used *at that time* and not in the sense in which a similar word might have been used by the California Legislature of 1872. Language is a democratic and popular process. Usage determines meaning. And the history of the English language is replete with illustrations of words the meaning of which has either been enlarged or entirely changed in the course of a few decades. Courts must bear this in mind in endeavoring to interpret words used in legislative enactments. So doing, the conclusion is inescapable that the word "mining" in the section has the broad meaning which is now given to it. The phrase in which it occurs also lends support to this interpretation. "Mining purposes" is a broader term than "mining." It might apply to operations which could not be strictly associated with mining proper. It would include activities ancillary to the mining operations themselves, which could not be classified strictly as mining, if they served the ultimate purpose of mining. So that when the section speaks of equipment and machinery used or to be used "for mining purposes," the language is broader than if the Legislature had referred to machinery or equipment used or to be used "in a mine" or "in mining."

The object of the section was to protect purchasers in good faith, encumbrancers or those who had extended credit to a person in possession of such equipment and machinery against the unrecorded claims of sellers under a conditional sales contract. The section, in so far as it applies to livestock and other animate chattels, has been sustained by the Supreme Court of California as a valid classification. Seaboard Acceptance Corporation v. Shay (1931) 214 Cal. 361, 5 P.(2d) 882. Courts have declined to lay down hard and fast rules in the matter of classification in the exercise of the police power. They have adopted one test only, namely, that there be a reasonable basis for the classification. See In re Faber (C.C.A.9, 1930) 41 F.(2d) 726. And for a long list of federal cases dealing with the subject, see the writer's dissent in Morf v. Ingels (D.C.1936) 14 F.Supp. 922, 928.

Equipment and machinery used in mining operations are usually attached to the premises either underground or on the surface. In many instances they become, after installation, an integral part of a complicated machinery set-up. For that reason, section 661 of the California Civil Code makes certain equipment used in mining proper fixtures. But whether they become legally fixtures or not, persons dealing with a mining or oil operator may be misled by appearances as to ownership and acquire an interest in equipment and machinery or extend credit in a manner in which one acquiring an interest in ordinary personal property would not be. The very size of the ordinary type of mining machinery, the fact that it may be a part of other equipment forming a whole, might lead the unwary to assume that it had become a part of the real property or oil operation in which it is used.

So that the Legislature had a reasonable ground for extending the benefits of section 2980 to equipment and machinery used for mining purposes. The classification is not violative of the due process clause of the Fourteenth Amendment to the Constitution of the United States or of section 11, of article 1 of the Constitution of California, which provides that "all laws of a general nature shall have a uniform operation." Because of its unique nature, mining has been held a proper subject of classification. Quale v. Moon (1874) 48 Cal. 478; In re Martin (1909) 157 Cal. 51, 106 P. 235, 26 L.R.A.(N.S.) 242; and see In re Miller (1912) 162 Cal. 687, 124 P. 427, affirmed in Miller v. Wilson (1912) 236 U.S. 373, 35 S.Ct. 342, 59 L.Ed. 628, L.R.A.1915F, 829; In re Spencer (1906) 149 Cal. 396, 86 P. 896, 117 Am.St.Rep. 137, 9 Ann.Cas. 1105. The referee was, therefore, wrong in holding that the section did not apply to oil machinery or equipment. And as none of the contracts of conditional sales were acknowledged or recorded, and the creditors who extended credit had no knowledge of their existence, it follows that they are invalid. However, this conclusion does not determine the matter. We are confronted in the first review with the fact that the referee had made an order directing the receiver to pay the installments. This order recognized the validity of the contracts. And even under a most strict interpretation of the limited powers of a receiver in bankruptcy, under his duty to reduce to his possession and keep and conserve the property of the estate until a trustee is appointed, he would have the right to ask for authority to make payments on contracts relating to property in the estate in order to avoid forfeiture. Bankr.Act

§ 2(3), 11 U.S.C.A. § 11(3); Boonville National Bank v. Blakey (C.C.A.7, 1901) 107 F. 891; R. J. Reynolds Tobacco Co. v. A. B. Jones Co. (C.C.A.8, 1931) 54 F.(2d) 329; Acme Harvester Co. v. Beekman Lumber Co. (1911) 222 U.S. 300, 309, 32 S.Ct. 96, 56 L.Ed. 208; In re Kleinhans (D.C.N.Y.1902) 113 F. 107; Carson, Pirie, Scott & Co. v. Turner (C.C.A.6, 1932) 61 F.(2d) 693; Hartford Accident & Indemnity Co. v. Crow et al. (C.C.A.6, 1936) 83 F.(2d) 386, 31 Am.Bankr.Rep.(N.S.) 345.

The order of the referee was subject to review within ten days after it was made, under rule 84 of this district. A motion to set it aside upon legal grounds which were available to the receiver on review does not lie. Such a procedure, if sanctioned, would enable a litigant dissatisfied with the order of a referee to bide his time, allow the time for review to pass and then start a new proceeding, raising the points that were or could have been raised upon review from the order. Considerations of this character are at the basis of the fundamental rule that when the time within which the review of an order could have been asked, has elapsed, proceedings to set it aside will not be entertained. Otherwise the dissatisfied party, or one who is bound by the order, would acquire a *new* time limit for the urging of his objections upon terms of his own.

The language used by our own Circuit in Re Faerstein (C.C.A.9, 1932) 58 F.(2d) 942, 943, is apposite:

"When *an order is entered, the referee's power over the order is ended. The remedy is exclusive and he may not review or change the order.* In re Russell (D.C.) 105 F. 501; In re Wister & Co. (D.C.) 232 F. 898; also, In re Greek Mfg. Co. (D.C.) 164 F. 211; In re Marks (D.C.) 171 F. 281; In re Avoca Silk Co. (D.C.) 241 F. 607; Matter of J. W. Renshaw's Sons, Bankrupt (D.C.) 3 F.(2d) 75; Matter of Wm. L. David (C.C.A.) 33 F.(2d) 748; David v. Hubbard, 280 U.S. 514, 50 S.Ct. 19, 74 L.Ed. 585.

"That the procedure of review is plainly defined and power limited in the interest of regularity and for the common good is clearly stated by Judge Sawtelle of this court, sitting as District Judge, in re Octave Mining Co. (D.C.) 212 F. 457, 458, as follows: 'It is manifest that the mode prescribed by General Order 27 is the only manner in which the decisions of the referee may be reviewed.'"

And see In re David (C.C.A.3, 1929) 33 F.(2d) 748; Patents Process, Inc. v. Durst (C.C.A.9, 1934) 69 F.(2d) 283; Leslie v. Floyd Gas Co. (D.C.Ky.1935) 11 F.Supp. 401; United States v. Dowell (C.C.A.8, 1936) 82 F.(2d) 3, 31 Am.B.R.(N.S.) 85; Wayne United Gas Co. v. Owens-Illinois Glass Co. (C.C.A.4, 1936) 84 F.(2d) 965; Compton v. Northwest Engineering Co. (1931) 116 Cal.App. 523, 2 P.(2d) 1014; Hall v. Imperial Water Co. No. 3 (1926) 200 Cal. 77, 251 P. 912. The questions raised before the referee upon the motion to vacate the previous order as to the legal rights of the creditors could have been raised upon the hearing on the order to show cause. It is therefore res adjudicata. Southern Pacific Co. v. Van Hoosear (C.C.A.9, 1934) 72 F.(2d) 903. And our conclusion that the order could have been successfully resisted does not affect the finality given to it by rule 84 of this District, after the expiration of the time for review. Patents Process, Inc. v. Durst, supra; General Order 27, 11 U.S.C.A. following section 53; Gilbert's Collier on Bankruptcy (3d Ed.1934) § 868; Roberts Auto & Radio Supply Co. v. Dattle (C.C.A.3, 1930) 44 F.(2d) 159.

The order of the referee denying the motion to vacate the previous order made in the matter of the Oil Tool Exchange, Inc., must, therefore, be sustained. The conclusion reached as to the applicability of section 2980 of the California Civil Code to oil equipment and machinery would call for a conclusion different from that of the referee, but for the fact that we are satisfied, from the undisputed facts, that the dehydrator cannot be said to be equipment or machinery used for "mining purposes."

■ Before stating our grounds for this conclusion, we advert to certain facts and principles relating to the contract of conditional sale under consideration. It is settled law in California that upon default in a conditional sales contract which reserves title in the seller until full payment of the purchase price, the seller may retake the property. Liver v. Mills (1909) 155 Cal. 459, 460, 101 P. 299; Bailly v. Loock (1930) 101 Cal.App. 220, 284 P. 235. There was such default here. The seller was, therefore, entitled to reclaim the dehydrator unless the contract was within the purview of section 2980. If it was, there was no compliance with the

252

section, as it was neither acknowledged nor recorded as required by it.

Now to the facts as to the nature and the operation of the dehydrator.

In considering oil extraction, it is to be borne in mind that the moment oil is brought to the surface "the mining" has been completed. The oil having been brought to the surface, it may be sold to persons either in what is known as the "wet" form or "clean" or "dry" form. These terms have acquired a definite meaning in the oil industry. "Wet" oil is oil which carries in cohesion with it more than 3 per cent. by volume of water and sediment. "Clean" or "dry" oil is oil which has 3 per cent. or less of these impurities. The process of extracting oil does not involve, in the case of "wet" oil, its dehydration. Alamitos Land Co. v. Shell Oil Co. (1935) 3 Cal.(2d) 396, 44 P. (2d) 573. Counsel for the trustee have drawn an analogy between dehydration and smelting of mineral ores. United States v. United Verde Copper Co. (1903) 8 Ariz. 186, 71 P. 954. We do not think the analogy is tenable. Smelting is an integral part of mining. Metals or minerals (other than oil or the like) are not found in pure form. They are amalgamated with large quantities of ores. And in mining other than placer mining, the extraction of the ore from a mine gives the miner a large quantity of compound only containing a small quantity of mineral or metal. To obtain this, he must subject the ore to milling or smelting. The process of mining is, therefore, not completed until the ore has been milled or smelted. Oil comes out of the ground *as oil*. And, in many instances, it is sold in the condition in which it comes out of the ground to persons who, in order to improve its quality, dehydrate it. The dehydration is, therefore, not a part of the extraction of oil.

The construction and the operation of the electrical dehydrator here involved confirm this conclusion. The electrical dehydrator, comprising dehydrating tank on foundations with inner electrodes and insulators, entrance bushing, float switch, step-up transformer, switchboard, choke coil, switch box, pipe and fittings, and wiring, is patented equipment used for the purpose of separating water in oil emulsion in order that "dry" oil may be obtained from wells producing oil with a water content of three per cent. or over. The installation of the particular dehydrator was completed on May 23, 1935. It was attached to the flow line of the bankrupt's well at a point approximately 75 feet from the well head. The dehydrator operates in the following manner: When the fluid produced by the well consisting of a water and oil emulsion enters the dehydrator, the emulsion flows through an electric field between a grounded electrode and a live electrode connected through an entrance bushing to a source of high voltage electric current. While passing through this field, the small electrically charged water particles are liberated by rupturing the surrounding oil films. Then follows a process of coalescence of the water particles through several stages into few and larger drops which form and rapidly settle by gravity to the bottom of the dehydrator. The clean oil freed from the emulsion rises continually to the top of the dehydrator and flows into the storage tanks, from which it is shipped or permitted to be carried through pipe lines to a refinery, while the water carrying all undesirable salts is automatically drawn off the bottom of the dehydrator in a continuous stream.

When the well of the bankrupt was first brought in, the fluid produced from it was, for a short time, sold by the producers without being dehydrated at the well. Tests were made of the fluid to determine the amount of water therein, which revealed that it contained more than 3 per cent. water. After these tests the dehydrator was installed for the purpose of dehydrating it.

The dehydrator has at all times been used by the bankrupt and the trustee, solely for the purpose of dehydrating the emulsion after its removal from the well. The emulsion is subjected to dehydration *only after* it has been raised to the surface of the ground and piped to the dehydrator. The dehydrator *is not* used for and has no effect upon the drilling or exploration for oil, nor on the removal from the well of the fluid produced from the well. The fluid produced from a well is sometimes transported a considerable distance from the situs of a well before it is dehydrated. Oil wells which at first produce "dry" oil not requiring dehydration may later develop a water and oil emulsion which requires dehydration.

These facts indicate clearly an operation intended merely to give the operator a purer oil—an operation without which his product would still be considered "oil"

and marketable as such. Under the circumstances to classify a dehydrator as "equipment" or "machinery" used in "mining operations" would mean to extend unduly the meaning of the section. Its effect would be to treat as a mining operation a process aiming merely to improve the quality of the product. If this were done, it could be urged, with equal plausibility, that it should be held to include refining also, and that "mining" for oil be extended to cover the various refining or cracking processes through which oil is reduced into various substances, as its by-products, which are marketed as such.

Even a most liberal interpretation of the legislative aim embodied in section 2980 would not justify such a conclusion. The order of the referee is affirmed. Orders accordingly. Exceptions to the trustee.