This is an appeal by David Albert Bruner, a life tenant entitled to a portion of the net income from the testamentary trust created by the will of his uncle, Peter Anthony Bruner, deceased, from a decree dismissing his exceptions to the Fifth and Partial Account of the trustees.
Testator, a resident of Butler County, died May 9, 1940, and by his will, after making some minor bequests, devised and bequeathed the remainder of his estate to Clement Stephen Rodgers and Andrew Dennis McNamara, Trustees, in trust, with direction to pay the net income semi-annually, as follows: 1/3 to his brother, Joseph Bruner, for and during his life; 1/3 to his step-sister, Elizabeth Rodgers, for her life; and 1/3 to the children of his sister, Annie Bruner McNamara, share *Page 554 
and share alike. He also directed his trustees, for a period of three years after the death of both Joseph Bruner and Elizabeth Rodgers, to pay the net income to appellant and certain other designated nephews and nieces; and also directed final distribution to certain designated nephews and nieces, including appellant, and fixed their distributive shares. The will also provided: "It is further my will and I hereby provide that my said trustees, who are my executors hereinafter named, are authorized and empowered to sell and dispose of any and all of the property of my estate, real, personal and mixed, of which I may die seized and possessed at any time they deem it advisable and to the best interests or my estate so to do, and at such prices and upon such terms and conditions as they deem advisable."
Joseph Bruner, testator's brother, died August 23, 1941, and Elizabeth Rodgers, his step-sister, died November 7, 1946, so that three years from the death of the survivor of them have now expired. This, however, has no bearing on the determination of the question here involved.
Testator died possessed of a very large estate, consisting, among other things, of two oil and gas leases in Indiana and eight in Illinois, beside royalty interests in several leases in the latter State. Among the Illinois leases were (a) an undivided one-half interest in the oil, gas and other minerals in and under a certain tract of land comprising 108 acres, situate in Wayne County, Illinois, conveyed to him by deed of Leslie Hubbell and wife, which property is hereinafter referred to as the Hubbell tract; and (b) an oil and gas lease on 280 acres of land in the same county and State owned by Wilson Flextor, which lease is hereinafter referred to as the Flextor lease. These two are the subject of the present controversy. No wells had been drilled on either tract up to the time of testator's death. *Page 555 
In March, 1941, the executors and trustees of the estate of testator, and a number of heirs under his will, together with the heirs of Hubbell and his wife (owners of the other undivided interest in the Hubbel tract), entered into an oil and gas lease with one John Sanders. The consideration to the testator's estate was what is termed a bonus and 1/16 of all oil that would be produced. Shortly after the execution of this lease, the lessors filed a bill of complaint in the Circuit Court of Wayne County, Illinois (under the authority contained in Chapter 104, section 25, Illinois Annotated Statutes[1]), in which thirteen other legatees and heirs of testator, who had not joined in the execution of the lease to Sanders, were named as defendants. In the bill, it was averred, inter alia, that two wells on adjoining properties were direct offsets to the Hubbell tract and were depleting the oil and gas thereunder, and its prayer was that a guardian ad litem be appointed for minor defendants and unknown heirs of a deceased heir, and that a decree be entered authorizing Sanders or his assigns to enter upon the Hubbell tract to drill for oil and gas. On May 19, 1941, the court entered a decree, confirming the lease with Sanders, authorizing him to enter upon the property, drill wells thereon and sell and dispose of the oil and gas produced therefrom, and "that payments for the proportion due to the royalty owners shall be made as follows: . . . (b) To Clement *Page 556 
Stephen Rodgers and Andrew Dennis McNamara, as Executors and Trustees of the Estate of Peter Anthony Bruner, Deceased, and to their successors in office, subject to the terms of the trust created under and by virtue of the Last Will and Testament of Peter Anthony Bruner, Deceased, an undivided one-half of the proceeds thereof." Since that time operations have been conducted continuously under the lease, and trustees have received a bonus of $500 and $48,844.46 from the sale of 1/16 of the oil up to December 31, 1947.
On February 19, 1944, trustees assigned the Flextor lease to J. W. Rudy for $6,000 in cash and an agreement to deliver to the credit of trustees, free of cost, in the pipe line 7/64 of all the oil produced and conveyed from the leased premises, as well as a similar interest in any gas produced. No gas was found, but the total receipts from oil to December 31, 1947, was $17,979.21.
The auditor held that the bonus of $500, as well as $48,844.46 obtained by trustees from the sale of 1/16 of the oil from the Hubbell tract;[2] and $6,000 payment and $17,979.21 received from the sale of 7/64 of the oil under the assignment of the Flextor lease were properly assigned by trustees to corpus, rather than income. Exceptions were taken to this determination, and they were dismissed by the Auditor and by the learned court below.
It is well settled in this Commonwealth that a life tenant is entitled to the royalties from an oil well drilled or a coal mine opened in the life time of testator, and, if no well be drilled or coal mine opened in testator's *Page 557 
lifetime, but trustees are empowered by the trust instrument to lease the oil or coal, the same principle of law is applicable:Wentz's Appeal, 106 Pa. 301. On the other hand, if there were no wells drilled or mines opened and no power given to lease the oil or coal or authorization given to operate such business, the royalties received, or to be received, under the terms of the lease are principal and not income. See McFadden'sEstate, 224 Pa. 443, 73 A. 927. Oil in place, being a mineral, is part of the realty, and it is like coal or any other natural product which in situ forms part of the land: Appeal ofStoughton et al., 88 Pa. 198.
In the instant case, the will gave trustees no power to lease or authority to carry on testator's business. While they were given authority to sell, no power to lease may be inferred from that fact alone: Peirce v. Peirce, 195 Pa. 417, 46 A. 78.
The lease executed with Sanders for the oil under the Hubbell tract provides, among other things, that "If oil shall be found . . ., then this lease shall be and remain in force so long thereafter as oil or gas or either of them is produced from said land by Lessee, or the said premises are being developed and operated by said Lessee, and if the Lessee shall commence to drill a well within the term of this lease or any extension thereof, the Lessee shall have the right to drill such well to completion with reasonable diligence and dispatch, and if oil or gas, or either of them, be found in paying quantities, this lease shall continue and be in force with like effect as if such well had been completed within the term of years first mentioned." In reality, the lease contemplates removal of all the oil and is in effect a sale, with payment to be made as the mineral is removed. Obviously, it was a sale of part of the principal of the trust and properly the moneys received therefrom belonged to the corpus. *Page 558 
This Court said, in Blakley et al. v. Marshall, 174 Pa. 425,429, 34 A. 564: "An oil lease, investing the lessee with the right to remove all the oil in place, in the premises, in consideration of his giving the lessors a certain per centum thereof, is in legal effect a sale of a portion of the land and the proceeds represents the respective interests of the lessors in the premises. If there be life tenants and remainder-men, the former are entitled to the enjoyment of the fund (i.e. interest thereon) during life, and at the death of the survivor the corpus of the fund should go to the remainder-men. This is as nearly a just and equitable distribution as can be made."
With reference to the Flextor lease, the record here shows that testator bought this lease on May 5, 1937, paying therefor $7,000, and that on February 19, 1944, trustees sold and assigned it to Rudy for $6,000 and 7/64 of all oil it produced. The learned court below, in holding that the amounts received by trustees from this sale belonged to corpus, correctly said: "It will not be contended that the $6,000.00 should be considered as income of the estate of the decedent. It might have happened that this lease would produce no oil. These trustees had no authority to engage in the oil business and risk the assets of the estate in drilling oil wells. They let Mr. Rudy take the chances and if it prove successful, the estate of the decedent would profit too. The 7/64 of all the oil produced was no less part of the sale price than the $6,000.00 paid when the lease was sold."
In stating the Pennsylvania rule (beginning with Eley'sAppeal, 103 Pa. 300, and having its latest expression in Knox'sEstate (No. 1), 328 Pa. 177, 195 A. 28, this Court said that where there is a power given to the trustee "to sell or lease", the income from mines or wells opened in accordance with the power belongs to the life tenant as if the wells or mines had been opened *Page 559 
during testator's lifetime. It was never our intention, however, that that principle should apply to a case such as the instant one, where testator has neither authorized trustees to lease or engage in the oil or mining business.
We have carefully examined the will of testator and can find nothing within its four corners which would indicate an intention to give the life tenants the royalties from the Hubbell tract and Flextor lease as income. We do not think the confirmation of the lease covering the Hubbell tract by the decree of an Illinois court has any bearing on the present issue. As the learned court below stated: "The law of Illinois, the situs of the property of course would decide what would constitute a valid oil lease. That they have determined.
"The estate of this decedent is to be settled in this . . . [Commonwealth]. What becomes of the funds or income derived from this lease, whether it shall be considered income and be distributed as such or whether it shall be considered corpus, is to be determined under the law of Pennsylvania." We agree with that statement and conclude that following the law of Pennsylvania the funds were properly allotted to corpus.
Order affirmed; costs to be paid out of the corpus of the trust estate.
[1] This statute provides, among other things: "That when lands in this state are owned by joint tenants, tenants in common or co-parcenars (whether such right or title is derived by purchase, devise or descent, or whether any or all of the claimants are minors or of full age), and the oil and gas is being drained or is in imminent danger of being drained from such lands by means of wells on other lands, such of said joint tenants, tenants in common or co-parcenars as hold a majority interest in such lands may be authorized to drill for and remove oil and gas from such lands in the manner hereinafter provided."
[2] The Fifth and Partial Account of trustees is here under consideration. In the former accounts, the income from the Hubbell tract was held by the auditor to be corpus. No exceptions were taken to those accounts as filed. In view of our disposition of this controversy on its merits, we deem it unnecessary to pass upon the question as to whether it is proper at this time to again raise the matter by excepting to the Fifth and Partial Account. See: Neafie's Estate, 325 Pa. 561,191 A. 56.