Harry Faber WHITE, Plaintiff,

v.

NEW YORK STATE NATURAL GAS
CORPORATION and Tennessee Gas
Transmission Company, Defendants.

Civ. A. No. 16680.

United States District Court
W. D. Pennsylvania.

Dec. 29, 1960.

J. Perry Eckels, Meadville, Pa., for plaintiff.

William H. Eckert, Pittsburgh, Pa., for defendant.

MILLER, District Judge.

■■ In this proceeding, plaintiff, as owner of a partial interest in the proceeds from the sale of gas produced by certain wells, seeks an accounting and to restrain the artificial cutting-back and restriction of production. Defendants admit the curtailing of production, but allege by way of defense that the native reserve of gas in the drainage areas of these wells had previously been exhausted and that the gas now being produced is storage gas which has migrated from an adjoining underground storage pool. Defendants contend that production of this gas for plaintiff's benefit would amount to a wrongful taking of property belonging to the storage companies.[1] On the other hand, plaintiff denies that storage gas is being produced. Should that fact be established, however, plaintiff then contends that title to such gas is lost by its injection into natural underground reservoirs for storage purposes.

This action having been tried by the court without a jury, the court makes the following findings of fact and conclusions of law:

### Findings of Fact

1. Plaintiff is a resident and citizen of Crawford County, Pennsylvania. Defendant, New York State Natural Gas Corporation (hereinafter referred to as "defendant New York"), is a New York corporation and doing business in Pennsylvania. Defendant, Tennessee Gas Transmission Company (hereinafter referred to as "defendant Tennessee"), is a Delaware corporation and doing business in Pennsylvania. The amount in controversy exceeds the sum of $3,000 exclusive of interest and costs.

2. On November 2, 1935, C. E. Updegraff of Williamsport, Pennsylvania, was the owner of certain gas leases with producing gas wells thereon located in Genesee Township, Potter County, Pennsylvania. On that date, the said C. E. Updegraff and plaintiff entered into a contract under which plaintiff obtained a right to a portion of the proceeds resulting from the sale of the production of the gas wells involved. C. E. Updegraff retained to himself under that contract sole discretion to determine what, if any, gas should be sold, and accordingly, whether the wells should be produced.

3. By agreement dated June 1, 1940, C. E. Updegraff agreed to sell to North Penn Gas Company and North Penn Gas Company agreed to purchase all the gas produced from the O'Donnell Well No. 1 at a net price of 15½¢ per m. c. f.

4. Subsequently, the said C. E. Updegraff died and his son, Charles H. Updegraff, succeeded to the ownership of the gas leases and gas wells, either by will or through the intestate laws of the Commonwealth of Pennsylvania. Subsequently, in January 1956, said Charles H. Updegraff sold, transferred and con-

---

1. Defendants contend also that plaintiff, as owner merely of a partial interest in the *proceeds* from the sale of production, has no standing to compel the well operator to produce at maximum capacity. This question, raised previously on Motion for Summary Judgment by one of the defendants, has been decided adversely to defendants by Judge Sorg in an opinion dated December 30, 1958. D.C., 191 F.Supp. 38. Since the question turns solely on the interpretation of the written agreement considered initially by Judge Sorg, it will not be reconsidered. United States v. Wheeler, 3 Cir., 1958, 256 F.2d 745.

veyed the said leaseholds and gas wells to defendant New York.

5. In January 1955, the defendants New York and Tennessee entered into an agreement in writing, by the terms of which defendant New York agreed to obtain and transfer to defendant Tennessee an undivided one-half interest in the lands, leases, royalties and other interests of the so-called Ellisburg Pool, and thereafter operate the said Pool as a storage pool for gas on behalf of both defendants.

6. The only well involved in this case is the O'Donnell Well No. 1 (hereinafter referred to as the "O'Donnell Well") since the Cobb Well No. 1 was plugged and abandoned in July 1947 because of lack of production and has remained plugged and abandoned ever since. No income in any form has been received by the plaintiff on account of Cobb Well No. 1 since the year 1944. To date, plaintiff has continued to receive his portion of the proceeds from the sale of gas produced by the O'Donnell Well.

7. The O'Donnell Well is in an Oriskany Sand gas pool commonly known as the Ellisburg Pool located in Potter County, Pennsylvania. The Ellisburg Pool lies to the east of another Oriskany Sand gas pool commonly known as the Hebron Pool. For years it was thought that these two pools were separate gas pools, but it has now been established that they are in reality only two different parts of the same pool connected by a neck of porous and permeable Oriskany Sand.

8. The O'Donnell Well, designated by defendant New York as Well No. N482, was completed on March 28, 1935, but by September 1938, its production was dropping rapidly. By April 1942, its monthly production was under 2,000 m. c. f. and by August 1946, its monthly production was under 1,000 m. c. f. During the years 1950, 1951, 1952, 1953 and 1954, the annual production of the O'Donnell Well did not exceed 8,795 m. c. f. or an average of 733 m. c. f. monthly. The production of the well declined steadily as did also the pressure of the well. The pressure in the O'Donnell Well when it was brought in was 2,010 p. s. i. but had fallen to 21 p. s. i. in 1949, which was the last time that the pressure in that well was taken prior to August 1955. The same pattern of high original but rapidly declining production and pressure was also true of other gas wells in the Ellisburg part of the Hebron-Ellisburg Pool.

9. During October 1953, defendant Tennessee began to store gas from Southwest United States in the Hebron part of the Hebron-Ellisburg Pool and continued to do so through 1954, 1955 and thereafter to date. In July 1955, United Natural Gas Company (hereinafter referred to as "United") also began to store gas from the Southwest in the Hebron part of the Hebron-Ellisburg Pool and continued to do so thereafter to date.

10. In July 1955, the production of the O'Donnell Well suddenly jumped from 541 m. c. f. in the previous month to 1,904 m. c. f. This increase in production continued until in December 1955, it reached the level of 41,020 m. c. f. per month, which was higher than the monthly production had been at any time since August 1938. This monthly production in December 1955 was higher than the well's production for an entire year had been at any time since 1941. The well's production during the whole year 1954 was only 7,335 m. c. f. The pressure in the O'Donnell Well followed the same pattern as its production, soaring from 21 p. s. i. in 1949, to 685 p. s. i. in March 1960. This great increase in production and pressure was due solely to the migration from the Hebron area into the Ellisburg area of gas from the Southwest which had been stored in the Hebron area by defendant Tennessee and United, resulting in the production of such storage gas through the O'Donnell Well.

11. The analyses, both with respect to chemical content and physical properties, of the gas produced through the O'Donnell Well since the beginning of 1956 are substantially the same as the analyses of the gas from Southwest United States which has been stored in the Hebron part of the Hebron-Ellisburg Pool by defendant Tennessee and United; but differ ma-

terially from the analyses of the original native Oriskany gas produced from both the Hebron and Ellisburg parts of the Hebron-Ellisburg Pool and other Northern Pennsylvania Oriskany pools.

12. On July 1, 1955, the amount of native or indigenous gas (called the "reserve" in the parlance of the gas industry) left in the drainage area of the O'Donnell Well was 31,961 m. c. f. All of the native reserve of gas of the O'Donnell Well was extracted and produced at least by the end of 1955 and since that date all gas extracted and produced through the O'Donnell Well has been, and would be in the future if production were continued, storage gas from the Southwest which has been or will be stored in the Hebron area by defendant Tennessee and United and which has migrated, and in the future will migrate, from the Hebron part into the Ellisburg part of the pool.

13. A well which does not produce more than 404 m. c. f. per month, which is all that the O'Donnell Well produced in January 1955, and the production of which is under contract to be sold at 15½¢ per m. c. f., is not a commercially or economically profitable well to operate.

14. Realizing that the reason for the great increase in production of the O'Donnell Well which began in July 1955, was that gas belonging to and which had been stored in the so-called Hebron Pool by defendant Tennessee and United had migrated and was migrating into the so-called Ellisburg Pool and was being produced through the O'Donnell Well, defendant New York, in good faith in January 1956, reduced the production of the O'Donnell Well to a level above what it had produced for many years prior to the influx of the gas that defendant Tennessee and United had stored in the Hebron area.

15. The underground storage of gas from the Southwestern part of the United States in depleted pools in the Appalachian area, such as the so-called Hebron Pool and the so-called Ellisburg Pool, is essential to meet the public demand for gas in the Northeastern part of this country during the winter season.

## Discussion

The pivotal issue in this case is whether title to natural gas, once having been reduced to possession, is lost by the injection of such gas into a natural underground reservoir for storage purposes.

■ Preliminarily, it should be noted that the court is bound to apply Pennsylvania law, since its jurisdiction in this case is based solely on diversity of citizenship of the parties. Erie R. R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. However, the precise issue present here has never been decided by any appellate court in Pennsylvania.[2] Thus it is incumbent upon the court to make its own determination of what the Supreme Court of Pennsylvania

2. Apparently Kentucky is the only state in which this question has been decided. See Hammonds v. Central Kentucky Natural Gas Co., 1932, 255 Ky. 685, 75 S.W.2d 204; Central Kentucky Natural Gas Co. v. Smallwood, Ky.1952, 252 S. W.2d 866. For reasons set forth above, the court is of the opinion that these cases are not indicative of Pennsylvania law. At least three states have attempted to deal with the problem through legislation. Typical of such acts is that enacted in Oklahoma:

"All natural gas which has previously been reduced to possession, and which is subsequently injected into underground storage fields, sands, reservoirs and facilities, shall at all times be deemed the property of the injector, his heirs, successors or assigns; and in no event shall such gas be subject to the right of the owner of the surface of said lands or of any mineral interest therein, under which said gas storage fields, sands, reservoirs, and facilities lie, or of any person other than the injector, his heirs, successors and assigns, to produce, take, reduce to possession, waste, or otherwise interfere with or exercise any control thereover, provided that the injector, his heirs, successors and assigns, shall have no right to gas in any stratum, or portion thereof, which has not been condemned under the provisions of this Act, or otherwise purchased." Okla.Stat.Ann. tit. 52, § 36.6 (Supp.1960).

See also Colo.Rev.Stat. Vol. 4, § 100-9-7 (1953); Mo.Ann.Stat. tit. 25, § 393.-500 (Vernon's Supp.1960).

would probably decide in a similar case, resorting to such Pennsylvania cases in the general field as might exist so as to reach a decision consistent with Pennsylvania law. Gerr v. Emrick, 3 Cir., 1960, 283 F.2d 293; Bittner v. Little, 3 Cir., 1959, 270 F.2d 286.

■ This question has been considered by the Common Pleas Court of Allegheny County in an action by surface owners to restrain the storage of natural gas under their farm. Protz v. Peoples Natural Gas Co., 93 Pittsb.Leg.J. 239, affirmed 1945, 94 Pittsb.Leg.J. 139. Finding that no storage gas had migrated under plaintiff's land, the Chancellor nevertheless went on, by way of dictum, to conclude that in any event the presence of gas would not constitute an invasion of plaintiff's property rights, since defendant had lost title to such gas. A single lower court decision, of course, does not amount to such a consensus of nisi prius opinion as to bind a district court. Gerr v. Emrick, supra; Eckman v. Baker, 3 Cir., 1955, 224 F.2d 954. For reasons hereinafter discussed, the court declines to defer to this dictum.

The starting point for a complete understanding of title concepts in Pennsylvania, insofar as gas and oil are concerned, is the leading case of Westmoreland & Cambria Natural Gas Co. v. De Witt, 1889, 130 Pa. 235, 18 A. 724, 5 L.R.A. 731:

"Gas, it is true, is a mineral; but it is a mineral with peculiar attributes, which require the application of precedents arising out of ordinary mineral rights, with much more careful consideration of the principles involved than of the mere decisions. Water also is a mineral; but the decisions in ordinary cases of mining rights, etc., have never been held as unqualified precedents in regard to flowing, or even to percolating, waters. Water and oil, and still more strongly gas, may be classed by themselves, if the analogy be not too fanciful, as minerals ferae naturae. In common with animals, and unlike other minerals, they have the power and the tendency to escape without the volition of the owner. Their 'fugitive and wandering existence within the limits of a particular tract is uncertain,' as said by Chief Justice Agnew in Brown v. Vandergrift, 80 Pa. 147, 148. They belong to the owner of the land, and are part of it, so long as they are on or in it, and are subject to his control; but when they escape, and go into other land, or come under another's control, the title of the former owner is gone. Possession of the land, therefore, is not necessarily possession of the gas. If an adjoining, or even a distant, owner, drills his own land, and taps your gas, so that it comes into his well and under his control, it is no longer yours, but his. And equally so as between lessor and lessee in the present case, the one who controls the gas, has it in his grasp, so to speak, is the one who has possession in the legal as well as in the ordinary sense of the word." Id., 130 Pa. at page 249, 18 A. at page 725.

Applying this "minerals *ferae naturae*" doctrine, Pennsylvania courts have refused to enjoin use of a mechanical pump by defendant to obtain all the gas and oil obtainable through his land, Jones v. Forest Oil Co., 1900, 194 Pa. 379, 44 A. 1074, 48 L.R.A. 748, and the location by defendant of wells so near his property line as to drain gas from under an adjoining landowner's property. Barnard v. Monongahela Natural Gas Co., 1907, 216 Pa. 362, 65 A. 801.

Nevertheless, application of the *ferae naturae* analogy apparently has been limited to the original "capture" of native gas and oil. Insofar as title to gas and oil in place is concerned, the Supreme Court has long considered as firmly established the rule that

"* * * oil and gas are minerals, though not commonly spoken of as such, and while in place are 'part of the land' (Kier v. Peterson, 41 Pa.

357, 362; Funk v. Haldeman, 53 Pa. 229, 249; Stoughton's Appeal, 88 Pa. 198, 201; Marshall v. Mellon, 179 Pa. 371, 374, 36 A. 201, 35 L.R. A. 816, 57 Am.St.Rep. 601); like other minerals within the bounds of the freehold (which extends to the center of the earth—Chartiers Block Coal Co. v. Mellon, 152 Pa. 286, 295, 25 A. 597, 18 L.R.A. 702, 34 Am. St.Rep. 645), they may be the subject of sale * * * separate and apart from the surface and from any other minerals beneath it. This being true * * * like all other minerals they necessarily belong to the owner in fee or his grantee, so long as they remain part of the property, and though he cannot use them until he has severed them from the freehold, exactly as in the case of all other minerals beneath the surface, he nevertheless has an ownership which he can sell and which otherwise he will lose only by their leaving the property. * * * [A]s to the owner in fee and his grantees their 'dominion is, upon general principles, as absolute over the fluid as over the solid minerals. It is exercised in the same manner and with the same results.' Hague v. Wheeler, 157 Pa. 324, 341, 27 A. 714, 22 L.R.A. 141, 37 Am.St.Rep. 736." Hamilton v. Foster, 1922, 272 Pa. 95, 102–103, 116 A. 50, 52.

See also Bruner Estate, 1950, 363 Pa. 552, 70 A.2d 222, 18 A.L.R.2d 92; Wilson v. A. Cook Sons, Co., 1929, 298 Pa. 85, 148 A. 63; Erie v. Public Service Comm., 1924, 278 Pa. 512, 123 A. 471; Dierken v. Shultz, 1946, 159 Pa.Super. 173, 48 A.2d 43.

 Once severed from the realty, however, gas and oil, like other minerals, become personal property. Williams v. Bridy, 1957, 391 Pa. 1, 136 A.2d 832, 833 ("culm and other minerals"); 24 Am.Jur., Gas and Oil § 3.

Plaintiff urges the court to adopt as the only conclusion possible under existing Pennsylvania decisions one which would divest a storage company of title to stored gas by the mere injection of such gas into underground reservoirs. The court is urged to apply the "wild animal" analogy to stored gas which plaintiff contends has escaped to its natural habitat.

 In the alternative, plaintiff contends that title to the stored gas has been lost by reason of defendants' wilful confusion of its gas with that to which plaintiff is entitled.[3] Notwithstanding serious doubts as to the existence of any evidence concerning wilfulness on the part of United and defendant Tennessee,[4] the court is of the opinion that this plaintiff is in no position to invoke the benefit of the harsh "confusion of goods" doctrine. The native reserve of gas in the drainage area of the O'Donnell Well had already reached a level where production was uneconomical some time before the influx of storage gas from the Hebron part of the Hebron-Ellisburg Pool. At this point, even assuming plaintiff's rights to rise to the level of those of a lessor under a gas and oil lease,[5]

3. "Confusion of goods * * * is the willful and fraudulent intermixture of the chattels of one person with the chattels of another, without the consent of the latter, in such a way that they cannot be separated and distinguished. * * * [O]ne who has confused his own property with that of other persons shall lose it when there is a concurrence of these two things: First, that he has fraudulently caused the confusion; and secondly, that the rights of the other party after the confusion are not capable otherwise of complete protection." Stone

v. Marshall Oil Co., 1904, 208 Pa. 85, 93, 57 A. 183, 186, 65 L.R.A. 218.

4. The only testimony concerning prior knowledge that gas stored in the Hebron Pool could migrate into the Ellisburg Pool was given by John T. Galey, defendants' expert. Mr. Galey is an independent geologist and not in the employ of either defendant.

5. "So long as the lessee is acting in good faith on business judgment, he is not bound to take any other party's, but may stand on his own. Every man who in-

plaintiff no longer was entitled to compel production of the well. This being so, plaintiff now is in no position to assert beneficial interests in storage gas allegedly intermixed with native gas in which plaintiff no longer had any enforceable interest.

Generally stated, the law relating to ownership of wild animals is based on possessory concepts, with title being acquired only by reduction of the animal *ferae naturae* to possession and being divested by loss of possession through escape and return of the animal to its natural and ferocious state. 2 Am.Jur., Animals § 8–13.

It becomes readily apparent, however, that a strict application of this analogy to the present facts is of no benefit to plaintiff's cause. To begin with, the storage gas in question has not escaped from its owners. On the contrary, it is yet very much in the possession of the storage companies, being within a well-defined storage field, the Hebron-Ellisburg Field, and being subject to the control of the storage companies through the same wells by which the gas originally had been injected into the storage pool. Westmoreland & Cambria Natural Gas Co. v. De Witt, supra; Hicks v. American Natural Gas Co., 1904, 207 Pa. 570, 57 A. 55, 65 L.R.A. 209.

Moreover, there has been no return of storage gas to its "natural habitat," since Southwest gas, differing materially in chemical and physical properties from native Oriskany gas, is not native to the Oriskany Sands underlying the Hebron-Ellisburg Field. Deferring to the analogy of animals *ferae naturae* under the circumstances of this case would no more divest a storage company of title to stored gas than a zookeeper in Pittsburgh of title to an escaped elephant. 2 Am.Jur., Animals § 13.

Particularly enlightening on the question of the general utility of the analogy of wild animals is the following language from Hamilton v. Foster, supra:

"Much of the difficulty under which appellants labor would be removed if they did not attempt to extend the comparison made in Westmoreland Natural Gas Co. v. De Witt, 130 Pa. 235, 249, 18 A. 724, 725, 5 L.R.A. 731, far beyond the purpose for which it was intended. It was there said: 'Water and oil, and still more strongly gas, may be classed by themselves, if the analogy be not too fanciful, as minerals ferae naturae.' The analogy is not too fanciful, when understood in the sense in which the words were used, as appears in the next sentence: 'In common with [wild] animals, and unlike other minerals, they have the power and the tendency to escape without the volition of the owner'; but the first statement, whether or not qualified by the second, does not determine that oil and gas are not capable of ownership even when in place, or may not be the subject of a grant." 272 Pa. at page 102, 116 A. at page 52.

It seems clear from the foregoing that the Supreme Court of Pennsylvania does not subscribe to the theory that the analogy is a common denominator in all cases concerning title to gas and oil.[6]

---

vests his money and labor in a business does it on the confidence he has in being able to conduct it in his own way. No court has any power to impose a different judgment on him, however erroneous it may deem his to be. Its right to interfere does not arise until it has been shown clearly that he is not acting in good faith on his business judgment, but fraudulently, with intent to obtain a dishonest advantage over the other party to the contract." Colgan v. Forest Oil

Company, 1899, 194 Pa. 234, 242, 45 A. 119, 121; Young v. Forest Oil Company et al., 1899, 194 Pa. 243, 45 A. 121.

6. Use of the analogy in gas and oil cases has been criticized by a number of writers: 1 Summers, Oil and Gas, § 62 (Perm. ed. 1954); 2 Am.Law of Prop., § 10.8 (1952); Stamm, "Legal Problems in the Underground Storage of Natural Gas," 36 Tex.L.Rev. 161 (1957); Colby, "The Law of Oil and Gas," 31 Calif.L. Rev. 357 (1943).

Also important as a guide toward the decision of the novel issue presented here are certain recent enactments of the Pennsylvania Legislature, which manifest a strong public interest in the Commonwealth in promoting the development and use of underground storage facilities. Having previously deemed the transportation and supply of natural gas to be of sufficiently great public concern to declare it a "public use" and subject it to public utility regulation, Natural Gas Companies Act of May 29, 1885, P.L. 29, § 10, as amended, 15 P.S. § 1989 (Purdon's 1958), the Legislature recently has conferred upon gas companies the power of eminent domain for the condemnation of depleted structures for storage purposes, Gas Operations, Well-Drilling, Petroleum and Coal Mining Act of November 30, 1955, P.L. 756, 52 P.S. § 2401 (Purdon's Supp.1959)[7], has permitted underground storage in the vicinity of operated coal mines, Id. § 2301 et seq. (Purdon's Supp.1959), and has authorized the Department of Forests and Waters to lease lands of the Commonwealth for storage purposes, Act of August 24, 1951, P.L. 1362, § 1, as amended, 71 P.S. § 463(j) (Purdon's Supp. 1959).

In view of the foregoing, the court is of the opinion that the Supreme Court of Pennsylvania would hold that title to natural gas once having been reduced to possession is not lost by the injection of such gas into a natural underground reservoir for storage purposes.

This being so, plaintiff clearly is not entitled to the relief sought. "Specific performance will not be decreed if it is in violation of the rights of a third person which are superior to those of the plaintiff." Kiley v. Baker, 1942, 150 Pa. Super. 248, 251, 27 A.2d 478, 480; McDuffee v. Hestonville, M. & F. Pass. Ry. Co., 3 Cir., 1908, 162 F. 36; Restatement, Contracts § 368. Moreover, in view of the fact that the native reserve of gas in the drainage areas of both wells has long since been depleted, plaintiff is not entitled to compel production at any capacity. Colgan v. Forest Oil Company, supra; Young v. Forest Oil Company, supra.

### Conclusions of Law

1. The court has jurisdiction over the matter in controversy.

2. Defendants are under no obligation to plaintiff to operate or produce either the O'Donnell Well or the Cobb Well No. 1 at their maximum capacity or to operate or produce either well to any extent or at all.

3. Defendant New York acted in good faith in reducing the production of the O'Donnell Well in January 1956, since the gas then being produced through the O'Donnell Well was gas owned by defendant Tennessee and United which they had stored in the Hebron part of the Hebron-Ellisburg Pool.

### Order

And now, Dec 29, 1960, after trial by the court without a jury, and the hearing of all the evidence, and upon the Findings of Fact and Conclusions of Law, it is ordered and directed that judgment be entered in favor of the defendants, New York State Natural Gas Corporation and Tennessee Gas Transmission Company, and against the plaintiff, Harry Faber White, together with costs.

---

7. At least eleven other states have enacted similar legislation. Stamm, "Legal Problems in the Underground Storage of Natural Gas," supra.