[Civ. No. 20543. First Dist., Div. Two. Nov. 15, 1963.]

Estate of WILLIAM R. SLOAN, Deceased. GAIL ST. AUBYN HICKMAN et al., Objectors and Appellants, v. MARGARET SLOAN ST. AUBYN et al., Claimants and Respondents; WELLS FARGO BANK, as Trustee, etc., Petitioner and Respondent.

Cooley, Crowley, Gaither, Godward, Castro & Huddleson and John L. Cardoza for Objectors and Appellants.

Everett S. Layman, Kenneth S. Carey, Everett S. Layman, Jr., and Arthur J. Lempert for Claimants and Respondents.

Brobeck, Phleger & Harrison and Arnold I. Weber for Petitioner and Respondent.

TAYLOR, J.—This is an appeal by Gail St. Aubyn Hickman, Anne St. Aubyn Newton, William Sloan Upton and John Roland Upton, Jr., some[1] of the remaindermen of a trust created by the will of their grandfather, the late William R. Sloan, from the decree of settlement of the 28th annual account and report of the surviving trustee (hereafter referred to as the 1961 decree), modifying the 19th annual account and report (hereafter referred to as the 1953 decree), as to the allocation of certain oil royalties. The respondents, Margaret Sloan St. Aubyn and Anna Logan Sloan Upton, the daughters of William R. Sloan, are the income beneficiaries; respondent, Wells Fargo Bank American Trust Company, is the surviving trustee.

The testator, William R. Sloan, died on April 14, 1923, survived by his widow, Agnes G. Sloan, and his daughters, Anna and Margaret. Most of the estate was distributed to the trustees named in the will, who were to receive the rents, issues and profits, and income of the property, and to dispose of the same as provided in the will after paying necessary and proper expenses. All of the net income was to go to the widow for life, except for $25 a month to her sister, Anna M. Kiernan. On the death of the widow and her sister, all the net income would go to the daughters (if then living) in

---

[1]The others, who are not parties to this appeal, are Patrick Sloan Hickman, Vivien Anne Hickman, Margaret Gail Newton, John Nigel Newton and Carol Logan Newton, apparently the minor children of the appellants, and the contingent remaindermen, the five charities named in the will.

equal shares.[2] Anna M. Kiernan died on January 14, 1936, and Agnes Sloan on December 26, 1945. Since the latter date, the two daughters have been entitled to all of the net income of the trust.

Under the will, the trustees had no power to distribute anything to the life beneficiaries except ''rents, issues, profits and income,'' after deducting therefrom necessary expenses of administration. The trustees were given the power to sell trust property but required to invest and reinvest the proceeds, or to purchase or acquire other property, all of which was to be held upon the same uses and trusts as the original property.

This controversy concerns only two of the assets of the trust, hereinafter referred to as the Pleasant Valley interests and the Richfield interests. In 1923, 107 shares of stock of Pleasant Valley Farming Company, then appraised at $32,100, were distributed to the trustees. On April 23, 1943, Pleasant Valley distributed to its shareholders economic interests in gas and oil in place with a fair market value of a little over $46,000. Among these was an interest in oil-producing lands leased to the Standard Oil Company of California. Between 1943 and October 31, 1951, the trustees received net royalties in excess of $121,000 from the Standard Oil lease. Until the death of the widow in 1945, all such royalties were distributed to her. Thereafter, these royalties were distributed to Anna and Margaret. Depletion in an aggregate of $33,991.39 ($27\frac{1}{2}$ of $123,605.03, the gross royalties) was claimed as a deduction by the mother and daughters, in computing their respective federal income taxes from 1943 to October 31, 1951. No depletion was claimed by the trust prior to November 1, 1951.

The Richfield interests consist of mineral rights, including extraction, ingress and egress but not the fee, owned by the testator in certain lands in Cuyama Valley in San Luis Obispo County. These mineral rights were not separately described or referred to in the inventory of the estate or decree

[2]Provision was also made for the termination of the trust as to one-half of the corpus if and when either daughter died leaving issue, with this portion of the corpus going in equal shares to the living issue of the deceased daughter. In the event of the death of a daughter without issue, no part of the trust would terminate but the surviving daughter would be the sole income beneficiary. Upon the death of the surviving daughter, the trust would terminate. If the surviving daughter left living issue, they would receive the corpus in equal shares; if not, the corpus would go to five named charities.

of final distribution but were distributed to the trustees by the so-called omnibus clause of that decree. The fair market value of the Cuyama Valley mineral interests on April 14, 1923, was $5,445.25.

Early in 1948, oil was discovered in the Cuyama Valley. About June 19, of that year, the trustees entered into a written contract with Richfield Oil Company for the development of oil and gas from the mineral rights held by the trust. The agreement required the trustees to obtain a court determination of their right to enter into the agreement as the terms of the lease might extend beyond the termination of the trust.[3] The trustees instituted a declaratory relief action in the Superior Court of Alameda County for the purpose of obtaining such a determination. At the outset, a question arose as to whether some or all of the royalty income should be retained by the trustees until the termination of the trust. Since this question could not be determined in the declaratory relief action, that suit was abandoned. The trustees then filed their 19th report and account covering the period from October 31, 1951, to July 31, 1952, and asked for instructions as to: 1) their authority to enter into the Richfield agreement; and 2) the proper distribution of the royalties from the Richfield interests and the Pleasant Valley interests.

The Oakland Bank of Commerce was appointed as the guardian *ad litem* to represent the interests of the minor and unborn remaindermen. The trustees and Anna and Margaret took the position that all of the royalties were income and currently distributable to themselves as the current income beneficiaries and none retained by the trustees. The guardian *ad litem*, in its objections, took the position that all the royalties were to be retained by the trustees as corpus and only the income from the reinvestment of such royalties should be distributed to Anna and Margaret.

After a full hearing which extended over several days, a decree was entered on May 19, 1953. The decree confirmed the authority of the trustees to enter into the Richfield agreement as follows: Paragraph 28 of the findings of the decree recited that the trustees had the power and authority to execute the Richfield agreement and any other lease "...

---

[3]The terms of the lease were for 20 years and "as long thereafter as oil, gas or other hydrocarbons are produced." Furthermore, a trustee's general power to lease trust property does not include the power to lease for oil and gas. See cases collected in 22 So. Cal.L.Rev. 115 at pp. 119 et seq.

288

even though such properties are in the nature of wasting assets, provided that the royalty income produced ... be reasonably apportioned or allocated between the present income beneficiaries and the trustees as hereinafter ... provided. ..." The trustees were instructed to allocate 72½ per cent of the royalty income from the Richfield and Pleasant Valley interests equally to Anna and Margaret, the income beneficiaries, and 27½ per cent of the royalty income to the trustees as "retained royalties."

The trustees were further instructed that all of the "retained royalties" should be invested and reinvested, the income therefrom to be currently distributed to the income beneficiaries in equal shares. To accomplish this purpose, the trustees were also directed to establish two additional accounts, a "retained royalties account" and "income from retained royalties account." For purposes of distribution of the corpus of the trust upon termination of all or a part thereof, the trustees were ordered to treat the retained royalties in all respects as if they were part of the property distributed to them by the decree of final distribution.

No motion for a new trial was made and no appeal was taken from the decree of May 19, 1953. All parties to this appeal agree that the 1953 decree has become final and res adjudicata. In 1952 and 1953, in accordance with the 1953 decree, the trustees distributed 72½ per cent of the gross royalties to the income beneficiaries and retained the remaining 27½ per cent.[4]

The depletion allowance deduction for federal income tax purposes was allocated in the same proportion as the royalties. Thus, in computing net income in their fiduciary income tax returns for 1952 and 1953, the trustees deducted 27½ per cent of the royalties which they had retained as depletion allowance authorized by section 114 (b) (3) of the Internal Revenue Code of 1939. (26 U.S.C.A., § 114 (b) (3).) Likewise and for the same reason, in computing net income in their personal income tax returns for those years, the life beneficiaries deducted 27½ per cent of the royalties which had been distributed to them. The Alameda court was advised of this in the 21st and 22d acounts filed by the trustees for the calendar years 1952 and 1953, and approved these accounts and reports.

[4]In 1952, the trustees distributed $356,944.22 and retained $135,-392.64; in 1953, the trustees distributed $285,401.67 and retained $108,-255.80.

Upon examination of the tax returns for those years, the Commissioner of Internal Revenue, however, determined that the income beneficiaries were not entitled to take credit for any depletion allowance on the distributed royalties, and that the trustees should have taken all of the depletion allowance. This determination was upheld by the Tax Court (32 T.C. 301 (1959)) and sustained on appeal (*Upton* v. *Commissioner of Int. Rev.* (9th Cir. 1960) 283 F.2d 716, cert. den. 366 U.S. 911 [81 S.Ct. 1086, 6 L.Ed.2d 236]). The decision of the federal courts was based on section 23 (m) of the Internal Revenue Code of 1939 (26 U.S.C.A. § 23 (m)), which provides that in case of property held in trust the allowable depletion deduction shall be apportioned between the income beneficiaries and the trustee in accordance with the pertinent provisions of the instrument creating the trust, or in the absence of such provisions, on the basis of the trust income allocable to each. Accordingly, the Ninth Circuit concluded that the will required the trustees to preserve the corpus, as the only things the trustees were authorized to distribute were rents, issues, profits and income.

As to the question of whether the testator intended to include all oil well royalties under income, the Ninth Circuit considered this to be settled by the decree of May 19, 1953, stating: "In the decree no reasons are stated for directing this allocation, and the royalties to be retained by the trustees are nowhere referred to as return of capital. The conclusion is nevertheless inescapable that the trustees were ordered to retain the 27½ per cent on the theory that the testator intended this portion of the royalties to represent return of capital.

"This is the only basis on which the court was asked to require such a retention. Petitioners do not suggest any other theory on which the court could have ordered a retention of royalties, since the will required that all net income be distributed to the life beneficiaries. It is also significant that the decree of the Alameda County court contains no provision for the retention of any trust income except for part of the oil well royalties." (P. 722.) The court then cited other circumstances which lead to the same conclusion, such as the reference to "wasting assets."

Following the final adverse determination in the tax proceedings,[5] the trustees filed their 28th annual account and

[5]Respondents admit that the purpose of the instant proceeding was to seek a "supervening decision" of the court below, apparently to set the

petition for instructions in the Alameda County court. The petition sought an interpretation that the 1953 decree was only an allocation of royalty income between the beneficiaries and the trustees and not an adjudication that the retained royalties were corpus of the trust and required to be retained or set aside as a reserve for depletion. None of the remaindermen, including the appellants, participated in these proceedings.

The court approved the 28th annual account of the trustee and decreed that:

(1) the 1953 decree did not order the trustees to retain royalties as corpus; that the testator did not intend $27\frac{1}{2}$ per cent of the royalties to represent return of capital, or percentage depletion as percentage depletion had not been heard of at the time of the testator's death;

(2) the testator intended to include all royalties as income;

(3) the retained royalties were not required to be retained to preserve intact the value of the corpus at the time of the testator's death;

(4) the court's 1953 authorization of the Richfield agreement on the condition that a portion of the royalties be retained was not based on any requirement of preservation of the corpus, but was an exercise of its equitable powers as the will did not expressly authorize an agreement;

(5) the sentence in the next to the last paragraph of the opinion of the Ninth Circuit, *supra*, at page 725, stating "The Alameda County court apparently proceeded on the theory that the present value of the corpus is to be preserved" was erroneous as no findings as to value were made by the 1953 decree;

(6) the mineral interests creating the Richfield royalties had a nominal value at the time of the testator's death and that sums in excess of $1,000,000 were not and are not reasonable or necessary to preserve a corpus of nominal value.

The main contention on appeal is that the 1961 decree erroneously interpreted the 1953 decree as allocating $27\frac{1}{2}$ per cent of the oil royalty income to principal for some purpose other than to preserve the corpus of the trust. Appellants argue that as a matter of law they are entitled to have a portion of the oil royalties retained against the depletion of the wasting trust assets. They concede that they are bound

stage for a different result as to the depletion deduction in future federal tax litigation.

by the 1953 decree but contend that the 1961 decree is inconsistent therewith and is not binding because it is an attempt to change a judicial determination rather than to correct a clerical error or mistake. The respondents on the other hand contend that the 1961 decree is a correct and consistent interpretation of the 1953 decree and that the 1953 decree only allocated the royalty income between the life beneficiaries and the remaindermen, because the trustee was not authorized by the will to enter into the Richfield agreement which might burden the remaindermen by extending beyond the duration of the trust. The respondent trustee also challenges the right of the appellants to prosecute this appeal on the grounds that they are not aggrieved and were not parties to the record below when the 1961 decree was ordered. The respondent income beneficiaries contend that the 1961 decree is amply supported by the evidence as well as the subsequent annual accounts; that the matter is res judicata; that the 1961 decree is correct as under the will they are entitled to all of the income from the royalties; that the same court rendered both decrees and that the appellants are entitled only to preservation of the nominal value of the Pleasant Valley and Richfield interests at the time of the creation of the trust.

■ We turn first to the questions of the appellants' rights to prosecute this appeal. Section 938 of our Code of Civil Procedure provides that any ''aggrieved'' party may appeal. Clearly, the effect of the 1961 decree is to bring about an allocation of the depletion deduction less favorable to the trust estate for the years which were not settled by the above mentioned tax litigation. Consequently, the corpus of the trust when received by the appellants will be correspondingly smaller. Appellants as the remaindermen of the testamentary trust are entitled to appeal from an order adversely affecting their interest (*Estate of Moran*, 122 Cal.App.2d 167 [264 P.2d 598]; *Estate of Silver*, 92 Cal.App.2d 173, 175 [206 P.2d 895]).

It is well settled that the appellants' failure to participate in the matter below does not deprive them of this right to appeal (*Estate of Moran, supra*; *Guardianship of Copsey*, 10 Cal.2d 748 [76 P.2d 691]; *Guardianship of Copsey*, 7 Cal.2d 199, 203 [60 P.2d 121]; *Estate of Levy*, 4 Cal.2d 223, 226 [48 P.2d 675]; *Estate of Benner*, 155 Cal. 153, 154 [99 P. 715]). Respondents rely on an apparently conflicting series of authorities represented by *Estate of McDermott*, 127 Cal. 450 [59

P. 783]; *Estate of McDougald*, 143 Cal. 476 [77 P. 443];
*Eggert* v. *Pacific States S. & L. Co.*, 20 Cal.2d 199 [124 P.2d
815]; *Estate of Silver, supra; Rose* v. *Rose,* 110 Cal.App.2d
812 [243 P.2d 578]. These cases hold that in addition to
being a party "aggrieved" under section 938 of the Code of
Civil Procedure and entitled to appeal, a party must also be
a party to the "record" and move to vacate or otherwise
formally oppose the judgment appealed from below. An anal-
ysis of the cases cited by the respondents indicates that the
"parties of record" requirement was usually applied to ex-
clude parties who were not properly "aggrieved" and whose
interest with the particular litigation was not clearly estab-
lished or far more remote than the easily ascertainable inter-
est of a remainderman. It would be anomalous to hold that a
party bound by res adjudicata as the respondents argue is
not entitled to appeal from a decree so binding him. In the
instant case, although properly raised, the question is not of
great significance, as technically the trustee represents the
interest of the remaindermen as well as beneficiaries.

We turn to the respondents' contention that the appellants
are estopped from attacking the 1961 decree. Respondents
contend the later decree merely clarifies and corrects a cleri-
cal error in the 1953 decree, namely the omission of the
court's reasons for requiring the allocation of the retained
royalties between the income beneficiaries and the trust es-
tate. ▇▇ There is no question that independently as well
as under section 473 of the Code of Civil Procedure, the
superior court, regardless of the lapse of time, has inherent
power to correct mistakes in its judgments or orders (*Estate
of Goldberg*, 10 Cal.2d 709 [76 P.2d 508]; *Krouzian* v.
*Hagopian*, 167 Cal.App.2d 251 [334 P.2d 285]). This power,
however, is limited to mistakes which are not the result of an
exercise of judicial discretion (*Minardi* v. *Collopy*, 49 Cal.2d
348, 352 [316 P.2d 952]; *Bastajian* v. *Brown,* 19 Cal.2d 209
[120 P.2d 9]). ▇▇ Whether an error is judicial rather
than clerical depends upon whether it was the deliberate re-
sult of judicial reasoning and determination (*Makovsky* v.
*Makovsky*, 158 Cal.App.2d 738, 742 [323 P.2d 562]). ▇▇
If an error, mistake or omission is the result of inadvert-
ence, but for which a different judgment would have been
rendered, the error is clerical and the judgment may be cor-
rected to correspond with what it would have been but for
the inadvertence (*Kowalsky* v. *Nicholson*, 23 Cal.App. 160,
162 [137 P. 607]). ▇▇ It is primarily for the trial judge
to determine whether his order was an inadvertence and his

conclusion as to that question will not be lightly set aside (*Bastajian* v. *Brown, supra,* at p. 214).

However, in our opinion, the 1961 decree did not purport to correct a clerical error. It is apparent that respondents sought the 1961 decree to avoid the unfavorable conclusion of the intervening tax litigation. Most of the relevant portions of the 1961 decree do not pretend to advise the trustee with reference to the 1953 decree, but are independent declarations concerning the proper interpretation of the will of William R. Sloan under applicable California law. The interpretation of the will and the 1953 decree necessarily involve the exercise of a judicial function rather than the correction of a clerical error or mistake. Having once made its decision after regular submission, the court had no power to amend for judicial error (*Drinkhouse* v. *Van Ness,* 202 Cal. 359 [260 P. 869]). The 1953 decree exhausted the jurisdiction of the court, and it had no power to enter a contrary decree in 1961. The 1961 decree is void insofar as it is inconsistent with the 1953 decree, and to that extent is not binding upon the appellants (*Stevens* v. *Superior Court,* 7 Cal.2d 110, 112 [59 P.2d 988]).

Respondents' argument that the superior court's approval of the subsequent annual accounts was a construction of the 1953 decree as affecting only an allocation of "income" as that term is used in the will, is likewise without merit. In these subsequent proceedings, the only issue was the approval of the trustees' account. Since the proceedings were nonadversary in character and no issue was made as to the terms of the prior decree, the orders of approval cannot be regarded as constituting adjudications of the meaning of the 1953 decree.

While decisions of federal courts in matters of state law are not binding on state courts, they may be persuasive (*Silman* v. *Reghetti,* 7 Cal.App.2d 726 [47 P.2d 291]; *Smith* v. *Hume,* 29 Cal.App.2d Supp. 747 [74 P.2d 566]; *People* v. *Herbert's of Los Angeles, Inc.,* 3 Cal.App.2d 482 [39 P.2d 829]). This is particularly so, when, as in the instant case, the interpretation of the federal court is an imminently reasonable one. We think the federal court correctly held that the 1953 decree settled the question as to the testator's intent concerning the treatment of oil royalties, by requiring the trustees, in determining distributable income, to make due allowance for keeping the corpus intact by retaining 27½ per cent of the royalties as return of capital. As the federal

court pointed out, the percentage of royalties ordered to be retained conforms exactly with the 27½ per cent depletion allowance which is designed to preserve the value of a wasting asset. The 1953 decree specifically found that the properties involved were in the nature of wasting assets. Moreover, the federal court's interpretation of the 1953 decree is completely in accord with the common law rule as to wasting assets (*Estate of Bixby,* 55 Cal.2d 819 [13 Cal.Rptr. 411, 362 P.2d 43]) which is the applicable rule here as the trust was created before the 1953 enactment of the Principal and Income Law (Civ. Code, §§ 730-730.15). Respondents' argument that all of the oil royalties are income as held in the 1961 decree is more in accord with the Principal and Income Law which provides that income from property subject to depletion, including oil royalties, shall be treated as income and paid to the life beneficiary (Civ. Code, § 730.12; *Estate of Broome,* 166 Cal.App.2d 488 [333 P.2d 273]).

The only provision in the will which sheds any light on the question is the fourth paragraph authorizing the trustees to distribute to the life beneficiaries only "rents, issues, profits and income," after deducting necessary expenses of administration. The testator's intent to preserve corpus necessarily follows from this provision.

Respondents' argument, as reflected in the 1961 decree, that all the 1953 decree did was to allocate income and that there was not a retention of income to preserve corpus, can only be reached by ignoring large parts of the language thereof, as well as ignoring the instrument which created the trust, the will of the decedent. We note that the terms of the trust were mandatory in providing that all of the income was distributable. The trustees were given no discretion whatsoever as to the amount of income which was distributable. If the only purpose of the 1953 decree was to allocate income, without preserving the corpus, the court clearly was acting in the teeth of the trust instrument. We note also that the 1953 decree purports only to affect the distribution of royalty income from oil and gas operations. There is no attempt to allocate the distribution of nonroyalty income. The findings and conclusions in the 1961 decree that the 1953 decree was an allocation of income from sources other than royalties are erroneous.

Respondents, citing *Estate of Gartenlaub,* 185 Cal. 375 [197 P. 90, 24 A.L.R. 1] and *Estate of Duffill,* 180 Cal. 748 [183 P. 337], further argue that under California law the

remaindermen are entitled only to the preservation of the corpus as it existed at the time of the creation of the trust, and the 1953 decree expressly found that the Richfield and Pleasant Valley interests had nominal value. While the trust corpus might once have been considered of nominal value, future events proved to the contrary. At the time of the 1953 decree, the trust corpus was obviously of great value. Furthermore, the very authorities relied on by the respondents indicate that any depletion of the principal tends to frustrate the fundamental purpose of the trust (*Estate of Gartenlaub, supra* p. 375; *Estate of Duffill, supra*). ▮▮▮▮ It is a well established rule of the law of trusts that where the corpus consists of wasting property with income payable to one beneficiary and principal to another, as in the instant case, the trustee is under a duty to set aside a part of the receipts from the property as an amortization fund (3 Scott on Trusts (2d ed.) § 239; Bogert, Trusts and Trustees (2d ed.) § 827, p. 428; Restatement, Trusts, § 239; 18 A.L.R.2d 92, 115).

An allocation exactly like that of the 1953 decree was approved as in accord with the common law rule of this state prior to the adoption of the Principal and Income Law by our Supreme Court in *Estate of Bixby*, 55 Cal.2d 819 [13 Cal.Rptr. 411, 362 P.2d 43].[6] This is a somewhat more liberal rule than the majority common law rule in other jurisdictions which provides for an allocation of oil royalties entirely to principal where the well is unopened at the inception of the trust (the "closed well" doctrine) and entirely to income if the well is producing at the inception of the trust (the "open well" doctrine). (See cases collected in 18 A.L.R. 2d 92.) The Restatement of Trusts (§ 239, subd. (g)) recommends the apportionment of royalty receipts between income and principal unless otherwise provided, and the preservation of the principal in existence at the time of creation of the trust. This is exactly what the court did in the 1953 decree.

The 1961 decree is reversed as to those portions thereof which purport to interpret the will of William R. Sloan and the 1953 decree. The 1961 decree settling the 28th annual account is reversed as to those items therein which are not

---

[6]The case involved the question of whether contrary to the then-existing applicable law (the Principal and Income Law) the testator could give his trustee discretion to determine what was principal and what was income.

consistent with the ruling in this opinion. The decree is otherwise affirmed.

Shoemaker, P. J., and Agee, J., concurred.

The petitions of claimants and respondents and petitioner and respondent for a rehearing were denied December 11, 1963, and their petitions for a hearing by the Supreme Court were denied January 7, 1964.